**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FRIENDS OF YOSEMITE VALLEY;
MARIPOSANS FOR ENVIRONMENTALLY
RESPONSIBLE GROWTH ("MERG"),
      *Plaintiffs-Appellees,*

      v.

DIRK KEMPTHORNE, in his official
capacity as Secretary of the
Interior; THE NATIONAL PARK
SERVICE; JONATHAN B. JARVIS, in
his official capacity as Regional
Director of the Pacific West
Region, National Park Service,
Department of the Interior;
MICHAEL J. TOLLEFSON, in his
official capacity as Superintendent,
Yosemite National Park, National
Park Service, Department of the
Interior,
      *Defendants-Appellants.*

No. 07-15124

D.C. No.
CV-00-06191-AWI

FRIENDS OF YOSEMITE VALLEY;
MARIPOSANS FOR ENVIRONMENTALLY
RESPONSIBLE GROWTH ("MERG"),
                    *Plaintiffs-Appellees,*

                    v.

DIRK KEMPTHORNE, in his official
capacity as Secretary of the
Interior; THE NATIONAL PARK
SERVICE; JONATHAN B. JARVIS, in
his official capacity as Regional
Director of the Pacific West
Region, National Park Service,
Department of the Interior;
MICHAEL J. TOLLEFSON, in his
official capacity as Superintendent,
Yosemite National Park, National
Park Service, Department of the
Interior,
                    *Defendants-Appellants.*

No. 07-15791

D.C. No.
CV-00-06191-
AWI/DLB

OPINION

Appeals from the United States District Court
for the Eastern District of California
Anthony W. Ishii, District Judge, Presiding

Argued and Submitted
November 28, 2007—Pasadena, California

Filed March 27, 2008

Before: Alfred T. Goodwin, A. Wallace Tashima, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Wardlaw

**COUNSEL**

Ronald J. Tenpas, Assistant Attorney General, Environment & Natural Resources Division, U.S. Department of Justice, Washington, D.C., David C. Shilton, Charles R. Shockey, and Elizabeth A. Peterson, Attorneys, U.S. Department of Justice, Washington, D.C., Barbara Goodyear, Of Counsel, Field Solicitor, U.S. Department of the Interior, Oakland, California, for the defendants-appellants.

Julia A. Olson, Wild Earth Advocates, Eugene, Oregon, Sharon E. Duggan, Law Offices of Sharon E. Duggan, Oakland, California, for the plaintiffs-appellees.

**OPINION**

WARDLAW, Circuit Judge:

Twenty years after the Merced River, which lies in the heart of the Yosemite National Park, was designated a Wild and Scenic River, and seventeen years after the National Park Service ("NPS") was statutorily required to prepare a Comprehensive Management Plan ("CMP") for the Merced Wild

and Scenic River, the question whether NPS has developed a valid CMP is again before us. In 2003, we found certain deficiencies in an earlier CMP—the 2000 CMP—and remanded to the district court. *See Friends of Yosemite Valley v. Norton*, 348 F.3d 789 (9th Cir. 2003) (*Yosemite I*). We clarified our opinion in *Friends of Yosemite Valley v. Norton*, 366 F.3d 731 (9th Cir. 2004) (*Yosemite II*). On July 19, 2006, the district court ruled on cross-motions for summary judgment. It concluded that NPS continues to violate certain provisions of the Wild and Scenic Rivers Act ("WSRA"), 16 U.S.C. §§ 1271-1287, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321-4375, as well as our instructions in *Yosemite I* and *Yosemite II*. *Friends of Yosemite Valley v. Scarlett*, 439 F. Supp. 2d 1074 (E.D. Cal. 2006).

Appellants Dirk Kempthorne, in his official capacity as Secretary of the Interior; the National Park Service; Jonathan Jarvis, in his official capacity as NPS Regional Director of the Pacific West Region; and Michael Tollefson, in his official capacity as Superintendent of Yosemite National Park (collectively, "NPS") argue that the district court erred in finding that (1) the Merced Wild and Scenic River—Revised Comprehensive Management Plan and Supplemental Environmental Impact Statement ("2005 Revised Plan") fails sufficiently to "address . . . user capacities" as required by § 1274(d) of the WSRA; (2) the 2005 Revised Plan is deficient because it is not a wholly self-contained plan; and (3) the supplemental environmental impact statement ("SEIS") prepared for the 2005 Revised Plan violates NEPA.

We have jurisdiction under 28 U.S.C. § 1291 and affirm the district court. We hold that the 2005 Revised Plan does not describe an actual level of visitor use that will not adversely impact the Merced's Outstanding Remarkable Values ("ORVs") as required by *Yosemite I* and the WSRA, because the Visitor Experience and Resource Protection ("VERP") framework is reactionary and requires a response only after degradation has already occurred. Moreover, the interim lim-

its are based on current capacity limits and NPS has not shown that such limits protect and enhance the Merced's ORVs. And, as we made clear in *Yosemite II*, we again conclude that the WSRA requires that the CMP be in the form of a single, comprehensive document, which addresses all the required elements, including both the "kinds" and "amounts" of use, and thus the 2005 Revised Plan is deficient because it addressed only the two components struck down in *Yosemite I* and was not a single, self-contained plan. Finally, we conclude that the SEIS violates NEPA because the "no-action" alternative assumed the existence of the very plan being proposed; the three action alternatives—which are each primarily based on the VERP framework—are unreasonably narrow; and for the first five years, the interim limits proposed by the three alternatives are essentially identical.

## I.

### A. The Wild and Scenic Rivers Act

The Wild and Scenic Rivers Act ("WSRA"), 16 U.S.C. §§ 1271-1287, was enacted in 1968 out of concern for the preservation of United States rivers, many of which had been subjected to overdevelopment and damming. *See* Kenny Seale, Note, *The Effect of the Wild and Scenic Rivers Act on Proposed Bridge Construction*, 7 Wis. Envtl. L.J. 225, 227-29 (2000). In its opening section, the WSRA explains that it is intended to codify Congress's policy determination

> that certain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values, shall be preserved in free-flowing condition, and that they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations.

16 U.S.C. § 1271. As originally enacted, the WSRA named specific rivers or segments of rivers for inclusion in the Wild and Scenic River System ("WSRS"). *See id.* § 1274(a)(1)-(a)(8). The WSRA also sets forth a procedure for future designations to the WSRS. *See id.* § 1273(a). WSRS components are administered by the Secretary of the Interior (including any component administered by the Secretary of the Interior through NPS or the Fish and Wildlife Service) or, if the river falls within a national forest, the Secretary of Agriculture. *See id.* § 1281(c)-(d).

The WSRA framework designates rivers based on specific "outstandingly remarkable values" ("ORVs") which both justify the initial designation of a river as a WSRS component, *see id.* § 1271, and provide the benchmark for evaluating a proposed project affecting a designated river. While, under the WSRA, protecting and enhancing the designated ORVs is paramount, this goal may be compatible with other uses:

> [e]ach component of the [WSRS] shall be administered in such manner as to protect and enhance [those ORVs that] caused it to be included in [the WSRS] without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values[, with] primary emphasis . . . given to protecting its esthetic, scenic, historic, archeologic, and scientific features.

*Id.* § 1281(a). The WSRA further recognizes that "[m]anagement plans for any such component may establish varying degrees of intensity for its protection and development, based on the special attributes of the area." *Id.* To the extent that the WSRA conflicts with the Wilderness Act, *id.* § 1131-1136, or statutes administering the national park system and national wildlife system, the WSRA instructs that "the more restrictive provisions shall apply." *Id.* § 1281(b)-(c). The WSRA requires the administering agency to "take

such action respecting management policies, regulations, contracts, [and] plans . . . as may be necessary to protect such rivers in accordance with" the WSRA, and "cooperate with the . . . Environmental Protection Agency and with the appropriate State water pollution control agencies for the purpose of eliminating or diminishing the pollution of waters of the river." *Id.* § 1283(a), (c).

Once a river is designated as part of the WSRS, the following statutory timetable applies: (1) within one year, the administering agency is required to "establish detailed boundaries" for the river and classify it (generally or by its various segments) as "wild," "scenic," or "recreational," *see id.* §§ 1274(b); 1273(b); and (2) within three full fiscal years, the administering agency must prepare a comprehensive management plan ("CMP") "to provide for the protection of the river values," *id.* § 1274(d)(1). "The [CMP] shall *address* resource protection, development of lands and facilities, *user capacities*, and other management practices necessary or desirable to achieve the [WSRA's] purposes," *id.* (emphasis added).

## B. The Secretaries' Joint Guidelines

Because of inconsistencies caused by the WSRA's provision for administration by agencies under both the Department of Agriculture and the Department of the Interior, the President asked both Secretaries to jointly issue guidelines interpreting the WSRA. *See* National Wild and Scenic Rivers System; Final Revised Guidelines for Eligibility, Classification and Management of River Areas, 47 Fed. Reg. 39,454 (Sept. 7, 1982) (the "Secretarial Guidelines"). The Secretarial Guidelines interpret the management principles of § 1281(a) "as stating a nondegradation and enhancement policy for all designated river areas, regardless of classification." *Id.* at 39,458. The Secretarial Guidelines further explain that the WSRA requires the administering agency to manage each component so as to protect and enhance its ORVs, "while providing for public recreation and resource uses which do not

adversely impact or degrade those values." *Id.* at 39,458-59. The Secretarial Guidelines also envision the use of varying strategies and implementations, depending on the segment's classification and ownership. *Id.* at 39,459.

Notably, the Secretarial Guidelines discuss "carrying capacity," a term that does not appear in the WSRA itself[1] and is defined as "[t]he quantity of recreation use which an area can sustain without adverse impact on the [ORVs] and free-flowing character of the river area, the quality of recreation experience, and public health and safety." *Id.* at 39,455. The Secretarial Guidelines contemplate that

> [s]tudies will be made during preparation of the management plan and periodically thereafter to determine the *quantity and mixture* of recreation and other public use which can be permitted without adverse impact on the resource values of the river area. Management of the river area can then be planned accordingly.

*Id.* at 39,459 (emphasis added). The Secretarial Guidelines also require that a component's management plan state

> the *kinds and amounts* of public use which the river area can sustain without impact to the values for which it was designated[,] and specific management measures which will be used to implement the management objectives for each of the various river segments and protect esthetic, scenic, historic, archeologic and scientific features.

*Id.* at 39,458 (emphasis added).

---

[1]Congress added the current § 1274(d) to the WSRA in 1986. *See* Pub. L. No. 99-590, § 501(b)(3), 110 Stat. 3330, 3335 (1986). Thus the Secretarial Guidelines's use of "carrying capacity" predated the enactment of the "address . . . user capacities" language in § 1274(d).

## C. WSRA Designation of the Merced

In 1987, Congress designated segments of the Merced River as WSRS components, including sections flowing through the very popular Yosemite National Park, and its administrative site, El Portal. *See* Pub. L. No. 100-149, 101 Stat. 879 (Nov. 2, 1987) (codified at 16 U.S.C. § 1274(a)(62)(A)). In designating the Merced as wild and scenic, Congress instructed that the establishment of WSRA boundaries for and classification of those parts of the Merced falling within Yosemite or El Portal would be accomplished through amendment of the 1980 general management plan ("GMP") for Yosemite National Park, and that such amendment "shall assure that no development or use of park lands shall be undertaken that is inconsistent with the designation of such river segments." 16 U.S.C. § 1274(a)(62)(A).

Despite Congress's directive, NPS failed to issue the required CMP for the Merced in a timely manner, and was ordered to do so in earlier litigation. *See Sierra Club v. Babbitt*, 69 F. Supp. 2d 1202, 1263 (E.D. Cal. 1999) (ordering NPS to "prepare and adopt a valid [CMP] pursuant to 16 U.S.C. § 1274(d) in regard to the Merced River as designated under the [WSRA] no later than twelve months after the entry of this decision"). The twelve-month timetable was based on NPS's representation that it could complete a CMP in that amount of time. After obtaining a one-month extension, NPS finally issued a CMP in mid-2000 (the "2000 CMP"), well past the statutory deadline.

## D. *Yosemite I* and *II*

We have twice previously addressed the issues presented by this action. In 2003, we affirmed in part the Eastern District of California's findings of specific deficiencies in the 2000 CMP, and remanded for a correction of those deficiencies. *Yosemite I*, 348 F.3d 789. We clarified our opinion in 2004, and remanded for reconsideration of the motion for

injunctive relief filed by Friends of Yosemite Valley and Mariposans for Environmentally Responsible Growth (collectively, "Friends") in light of the clarification. *Yosemite II*, 366 F.3d 731.

Looking to the WSRA requirement that the administering agency "prepare a [CMP] . . . . [that] shall address . . . user capacities" within three full fiscal years of a WSRS segment's designation, 16 U.S.C. § 1274(d)(1), we concluded, in *Yosemite I*, that NPS's method of addressing user capacities was problematic. 348 F.3d at 797. The 2000 CMP's primary method of addressing user capacities was through a framework called Visitor Experience and Resource Protection ("VERP"). *Id.* at 796. "[T]he VERP framework focuses on the prescription and maintenance of selected 'desired conditions.' " *Id.* To maintain these "desired conditions," the VERP framework provides for "selecting and monitoring indicators and standards that reflect these desired conditions, and taking management action when the desired conditions are not being realized." *Id.* (internal citations omitted).

Analyzing the plain meaning of the terms within the phrase "address . . . user capacities" as well the Secretarial Guidelines, we interpreted the requirement to "address . . . user capacities" to mean that the CMP must include "*specific measurable limits on use*." *Id.* at 797 (emphasis added). "[T]he plain meaning of the phrase 'address . . . user capacities,' is simply that the CMP must *deal with or discuss the maximum number of people that can be received at a WSRS*." *Id.* at 796 (emphasis added). However, the plain meaning does not mandate "one particular approach to visitor capacity." *Id.*

Furthermore, the Secretarial Guidelines "interpret[ed] the WSRA to require the preparation of river '[m]anagement plans [that] state . . . the kinds and amounts of public use which the river area can sustain without impact to the [ORVs],' and to mandate ongoing studies to 'determine the quantity and mixture of recreation and other public use which

can be permitted without adverse impact on the resource values of the river area.' " *Id.* at 797 (quoting 47 Fed. Reg. 39,454, 39,458-59). The Secretarial Guidelines, however, do not require one particular method of limiting user capacity. *Id.* They do not mandate, for example, a numerical cap on visitors. *Id.* ("[T]he Secretarial Guidelines do not specify that this obligation can be satisfied only by capping the number of visitors.").

We concluded that the VERP framework, as set out in the 2000 CMP, failed sufficiently to address user capacities because it did not adopt "quantitative measures sufficient to ensure its effectiveness as a current measure of user capacities." *Id.* Rather than establish specific indicators or standards to implement the VERP, the 2000 CMP provided "examples" of indicators and standards. *Id.* at 796. By only providing illustrative standards, "the [2000] CMP fail[ed] to yield any actual measure of user capacities, whether by setting limits on the specific number of visitors, by monitoring and maintaining environmental and experiential criteria under the VERP framework, or through some other method." *Id.* This "fail-[ure] to provide any concrete measure of use," we found, was inconsistent with our interpretation of the phrase "address . . . user capacities." *Id.* at 797.

We instructed that "[o]n remand, the NPS shall adopt specific limits on user capacity consistent with both the WSRA and the instruction of the Secretarial Guidelines that such limits describe *an actual level of visitor use that will not adversely impact the Merced's ORVs*." *Id.* (emphasis added). Given that "NPS was supposed to have completed a CMP for the Merced River some twelve years ago," we indicated that we would expect temporary measures to be implemented as soon as practicable in order "to avoid environmental degradation pending the completion of [the] task." *Id.* at 803-04. In particular, we recognized that "[i]f the NPS is correct in projecting that it will need five years fully to implement the VERP, it may be able to comply with the user capacity man-

date in the interim by implementing preliminary or temporary limits of some kind." *Id.* at 797.

As elucidated in *Yosemite II*, in *Yosemite I*, "we held that the entire Merced Wild and Scenic River [CMP] is invalid due to two deficiencies: (1) a failure to adequately address user capacities; and (2) the improper drawing of the Merced River's boundaries at El Portal." *Yosemite II*, 366 F.3d at 731. Because the district court had, on remand, misconstrued our holding in *Yosemite I*, we explained that "[w]hile we remanded to the district court to enter an appropriate order requiring the [NPS] to remedy these deficiencies in the CMP in a timely manner, *we did not otherwise uphold the [2000 CMP]*." *Id.* (internal citations and quotation marks omitted; emphasis added). We concluded that, "[p]ursuant to our original Opinion [in *Yosemite I*], the [NPS] must prepare a new or revised CMP that adequately addresses user capacities and properly draws the river boundaries at El Portal." *Id.* In *Yosemite II*, we also "grant[ed] a temporary stay of proceedings and an injunction prohibiting NPS from implementing any and all projects developed in reliance upon the invalid CMP" pending the district court's consideration of the matter. *Id.*

## E. District Court Decisions on Remand

On remand, on July 6, 2004, the district court ordered NPS to develop a "new or revised CMP" and to "comply with NEPA by issuing a supplemental EIS." The district court also enjoined certain projects pending completion of the new or revised CMP. After a series of public scoping meetings, a draft of a revised CMP and SEIS was released for public review in January 2005. After approximately three months of public review, in June 2005, NPS issued its 2005 Revised Plan, a two-volume publication entitled, "Merced Wild and Scenic River—Revised Comprehensive Management Plan and Supplemental Environmental Impact Statement" ("2005 Revised Plan"). The Record of Decision ("ROD") for the

revised CMP was signed on July 25, 2005, adopting Alternative 2 from the SEIS. The 2005 Revised Plan states, as follows:

> [t]his revised plan will *amend the existing* Merced River Plan to address the two deficiencies identified by the Court . . . . This Revised Merced River Plan *does not replace* the Merced River Plan adopted in 2000, but corrects the deficiencies in its management elements.

On November 11, 2005, Friends filed their complaint with the Eastern District of California, alleging five causes of actions against NPS. Friends challenged the 2005 Revised Plan under WSRA, NEPA, the Administrative Procedure Act ("APA"), and our prior orders. The district court, on July 19, 2006, granted in part and denied in part the parties' cross-motions for summary judgment. *Friends of Yosemite Valley v. Scarlett*, 439 F. Supp. 2d 1074, 1108-09 (E.D. Cal. 2006).

The district court held that NPS failed to comply with our order that "[o]n remand, the NPS shall adopt specific limits on user capacity . . . [that] describe an actual level of visitor use that will not adversely impact the Merced's ORVs." *Id.* at 1098 (internal quotation marks omitted). According to the district court, "some sixteen years after [NPS] was required to create a [CMP] for the Merced River, [it] decide[d] that for approximately five years, it would like to experiment with implementing the VERP program as its primary means of addressing user capacity." *Id.* NPS also failed to commit to the use of the VERP program for the long run, stating that "whether VERP will become permanent after five years is not known at this time." *Id.* (internal quotation marks omitted). Rather, "[w]hat NPS has created in the VERP portion of the user capacity program in the 2005 Revised Plan is a tentative plan of uncertain duration which adopts temporary limits, which will apply for an unknown length of time." *Id.* at 1100. As stated by the district court, the agency "has left itself the

option of deciding in five years to abandon its currently proposed method and proceed in an entirely different, as yet unidentified, manner. Under this scenario, there is no indication when, if ever, NPS will finally adopt a permanent primary method for addressing user capacity . . . ." *Id.* at 1099. Furthermore, despite providing for interim limits while NPS conducts field testing of the VERP indicators and standards, NPS's interim limits, which are set to apply for a period of 5 years, "are simply the current physical capacity of the facilities in Yosemite Valley." *Id.* The court also criticized VERP for being "reactive" in that it calls for management action only after environmental degradation has already occurred. *Id.* at 1100.

The district court further found that the 2005 Revised Plan was deficient because "NPS has violated [the] WSRA by failing to adopt a single, self-contained [CMP] for the Merced River." *Id.* at 1094. It found that "language from the Ninth Circuit indicates an intention that a single document be produced, covering everything." *Id.* The court stated that although NPS is free to "us[e] parts[,] even very large parts," of the 2000 CMP in developing "a whole new or revised plan," it has "proceeded from the [incorrect] assumption that the 2000 [CMP] still exists." *Id.* at 1093.

The district court also held that the SEIS prepared in conjunction with the 2005 Revised Plan did not comply with the NEPA, 42 U.S.C. § 4321-4375, because it provided no true "no-action" alternative and because it lacked the required reasonable range of alternatives. *Friends of Yosemite Valley*, 439 F. Supp. 2d at 1105-07; *see* 40 C.F.R. § 1502.14(d) (requiring "the alternative of no action"); *id.* § 1502.14(a) (requiring that the EIS "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated"). According to the district court, the SEIS improperly relied on elements of the 2000 CMP to describe the environmental baseline. *Friends of Yosemite Val-*

*ley*, 439 F. Supp. 2d at 1105. The range of action alternatives was insufficient because each alternative is based on VERP, which the court had found inadequate to constitute the primary feature of a user capacity program as required by WSRA. *Id.* at 1106-07.

Next, on November 3, 2006, the district court issued an opinion and order enjoining significant aspects of nine projects in the Merced River corridor until NPS develops a valid CMP. *Friends of Yosemite Valley v. Kempthorne*, 464 F. Supp. 2d 993 (E.D. Cal. 2006). NPS appealed the district court's November 3 decision on December 28, 2006. A stay pending the appeal of its injunction was granted on March 22, 2007 with respect to two of these projects. *Friends of Yosemite Valley v. Kempthorne*, No. CV F 00-6191 AWI DLB, 2007 WL 896154 (E.D. Cal. 2007). On March 28, 2007, the district court issued an order approving the parties' stipulation regarding a completion date for a new CMP and EIS—on or before September 30, 2009. The district court also entered final judgment, which NPS appealed on April 24, 2007. NPS's appeals from the district courts' decisions are consolidated in the present case.

## II.

We review a district court's grant of summary judgment de novo. *Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 857 (9th Cir. 1999) (citing *Sierra Club v. Babbitt*, 65 F.3d 1502, 1507 (9th Cir. 1995)).

We review NPS's actions under the WSRA and NEPA pursuant to the APA, 5 U.S.C. §§ 701-706. Under the APA, we may set aside a decision " 'only if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.' " *Yosemite I*, 348 F.3d at 793 (quoting *Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1176-77 (9th Cir. 2000)). As discussed in *Yosemite I*,

> [t]he determination whether the NPS acted in an arbitrary and capricious manner rests on whether it "articulated a rational connection between the facts found and the choice made." *Pub. Citizen v. DOT*, 316 F.3d 1002, 1020 (9th Cir. 2003). "[C]ourts must carefully review the record to ensure that agency decisions are founded on a reasoned evaluation of the relevant factors, and may not rubber-stamp . . . administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute . . . ." *Id.* Nevertheless, we "may not substitute [our] judgment for that of the agency [but] must simply ensure that the agency has adequately considered and disclosed the environmental impact of its actions, bearing in mind that NEPA exists to ensure a process, not particular substantive results." *Hells Canyon*, 227 F.3d at 1177.

*Yosemite I*, 348 F.3d at 793. Also,

> [w]e apply a "rule of reason" standard to review the adequacy of an agency's EIS, asking whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences. This standard involves a pragmatic judgment whether the EISs form, content and preparation foster both informed decision-making and informed public participation, and is essentially the same as review for abuse of discretion.

*Id.* at 800 n.2 (internal citations and quotation marks omitted).

### III.

Preliminarily, although NPS appealed the interlocutory injunction, it did not address the issue of the injunction in either its opening or reply brief. Arguments not raised by a party in its opening brief are deemed waived. *E.g.*, *Smith v.*

*Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999); *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 738 (9th Cir. 1986) (concluding that we "will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief"). Thus, we do not consider the merits of the interlocutory injunction, but only the district court's rulings on the cross-motions for summary judgment.

## A.   Addressing User Capacities[2]

The 2005 Revised Plan, pursuant to the ROD, adopts VERP as its primary method of addressing user capacity. NPS argues that the district court erred in finding that the 2005 Revised Plan did not remedy the deficiency we found in the user capacity component of the 2000 CMP. According to NPS, sufficiently specific measurable limits on use can be found in (1) the Wilderness Trailhead Quota System; the Superintendent's Compendium limits; (2) the new VERP indicators and standards; and (3) the interim limits imposed by the User Capacity Management Program.

### 1.   Wilderness Trailhead Quota System &
### Superintendent's Compendium

**[1]** The district court properly concluded that neither the Wilderness Trailhead Quota System nor the Superintendent's

---

[2]While we have not required that NPS set a numerical cap on visitors but rather that it "deal with or discuss the maximum number of people that can be received at" the Merced, *Yosemite I*, 348 F.3d at 796, as counsel for Friends alluded to at oral argument, numerical limits on visitor use is commonly used by agencies in order to protect our natural environment. *See, e.g.*, *U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997, 1011-12 (D.C. Cir. 2002) (allowing numerical cap on the number of commercial air tours over the Grand Canyon and noting that "[l]imiting the number of visitors at a given time in a national park is a standard measure used to protect park resources"); *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1128-29 (8th Cir. 1999) (upholding the U.S. Forest Service's EIS where nine out of ten alternatives placed limits on visitor use at or below current levels).

Compendium[3] are "persuasive as to whether the 2005 Revised Plan adequately addresses user capacities." *Friends of Yosemite*, 439 F. Supp. 2d at 1096. Although they are steps in the right direction, both these methods for addressing user capacity "predate the 2000 [CMP] and were relied upon by [NPS] in support of that plan" to no avail. *Id.*

## 2.  VERP

**[2]** The district court correctly found that VERP does not properly address user capacities because, by not requiring a response to environmental degradation until after it already occurs, it is reactive and thereby violates 16 U.S.C. § 1281(a) and the Secretarial Guidelines, 47 Fed. Reg. at 39,458-59, interpreting the management principles of § 1281(a).

NPS argues that the district court based its holding on a legally incorrect view that the WSRA does not allow reliance on a program that monitors particular indicators, such as VERP, because such a program is, by definition, "reactive." According to NPS, that ruling is contrary to our holding in *Yosemite I*, where we held that NPS could address user capacities with a VERP framework that monitors and maintains environmental and experiential criteria. *See Yosemite I*, 348 F.3d at 796-97. NPS further contends that the district court's ruling incorrectly requires NPS to set specific limits on the number of visitors, even though we stated in *Yosemite I* that a numerical cap is not required. NPS misreads the district court's analysis, and its argument is therefore flawed. The

---

[3]The Wilderness Trailhead Quota System imposes limits on the number of overnight users allowed within the wilderness segments of the river, which comprise 51 of the 81 miles of the Merced under NPS management. It has been in place since the 1970s. The Superintendent's Compendium limits the time and location of specific activities, or imposes limits on the number of people allowed to engage in specific activities. For example it includes limits on overnight group size, day use group size, stock animals per group, stock animal travel areas and areas of non-motorized water craft use and fishing.

reason the district court found that the revised VERP was reactionary was not because a framework that monitors and maintains is inherently reactive and thus can never be proactive. Rather, the revised VERP at issue was found to be reactionary, and thus responsive after-the-fact to already occurring degradation, because it does not " 'describe an actual level of visitor use that will not adversely impact the Merced's ORVs.' " *See Friends of Yosemite*, 439 F. Supp. 2d at 1098-1100 (quoting *Yosemite I*, 348 F.3d at 797).

NPS next argues the district court incorrectly stated that the VERP as set out in the 2005 Revised Plan "is not oriented towards preventing degradation." It contends that the indicators and standards established in VERP trigger action *prior to* degradation of ORVs. In support, NPS asserts that (1) the indicators and standards are set conservatively so that, although management may not act before the indicators and standards are exceeded, action will be taken before there is degradation; (2) the text of the 2005 Revised Plan provides that "[i]ndicators, which are measurable variables, are determined first; standards quantifiably define the acceptable conditions (*i.e.*, measured values) for each indicator. . . . [which] are *set at a level that will protect and enhance* the Merced River's [ORVs]" (emphasis added); (3) NPS does not choose a particular indicator unless that indicator is "[a]ble to provide an early warning for resource degradation"; (4) management action may occur before a standard is exceeded because "[t]he process of monitoring and its relationship to management actions can be likened to a traffic signal . . . . A *yellow-light* condition occurs when monitoring shows that conditions are approaching the standard. This early warning sign may call for implementing proactive management actions to protect and enhance the [ORVs]"; and (5) the district court's conclusion is at odds with this panel's decision in *Yosemite I*.

**[3]** That an indicator *may be able* to provide an early warning, does not mean that it does in practice. A standard must be chosen that does in fact trigger management action before

degradation occurs. Also, that an early warning sign *may* call for the implementation of proactive management does not provide much assurance that such implementation will occur. Despite NPS's statements to the contrary, in *Yosemite I*, we did not foreclose a later finding by the district court that the VERP system remains problematic even if VERP does not rely on examples instead of actual indicators and standards. Currently, VERP *requires* management action only when degradation has already occurred, and it is therefore legally deficient.[4]

### 3. Interim Limits

[4] The district court properly concluded that the interim limits "do not describe an actual level of visitor use that will not adversely impact the Merced's ORVs." *Friends of Yosemite*, 439 F. Supp. 2d at 1099-1100. The 2005 Revised Plan adopted interim limits for a five-year period to restrict the kinds and amounts of visitor use in the Merced River corridor while the VERP program is being tested. These interim limits include caps on overnight lodging, campsites, day-visitor parking, bus parking spaces and employee housing units. Buses are limited to 92 per day in the Yosemite Valley seg-

---

[4]Although this does not alter our conclusion, NPS is correct that the district court erred to the extent that it interpreted the WSRA to require that a method adopted for addressing user capacity be permanent. An appropriate method must be in place. But, just as NPS has discretion in choosing a particular method of addressing user capacities, NPS has the discretion to make improvements to its method, or switch to a new method, based on new scientific evidence. *See Yosemite I*, 348 F.3d at 796-97. Furthermore, the very nature of VERP, which we concluded in *Yosemite I* could be an acceptable method of addressing user capacities if implemented properly, is fluid in that it is an iterative process that improves and adjusts with time. *See also Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 869-70 (9th Cir. 2004); *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 965 (9th Cir. 2003). NPS admits, nevertheless, that it has chosen VERP as its primary method of dealing with user capacity issues for the foreseeable future and takes issue with the district court's proper characterization of VERP as "tentative."

ment, which according to NPS, is consistent with the number of buses that entered the Yosemite Valley at peak periods such as in the mid-1990s. Day-visitor parking spaces, bus parking spaces, and overnight lodging facilities are set at existing levels. The number of campsites in Yosemite Valley would be allowed to increase slightly during the interim period by 163 sites for an interim limit of 638 sites, a level which, as NPS states, falls below both the number of campsites in the Yosemite Valley prior to the 1997 flood and when the Merced River was designated Wild and Scenic in 1987. Some of the limits, while at existing capacity limits, are below facility levels that existed in 1980, before the Merced River was designated under the WSRA.

According to NPS, its choice of interim limits is not arbitrary or capricious. NPS argues that "[i]f the status of the Merced River's ORVs was sufficient for eligibility in 1987 when Yosemite Valley had more parking spaces, rooms and campsites than at present, it would be improper to simply assume that the lower facility levels permitted under the 2005 [Revised Plan] will 'degrade' the ORVs." Furthermore, NPS argues that its decision is consistent with § 1281(a) of the WSRA because it does not "limit[ ] other uses that do not substantially interfere with public use and enjoyment of" the Merced's ORVs. 16 U.S.C. § 1281(a).

**[5]** There is no authority for a presumption that holding facility levels to those in existence in 1987, when the Merced was designated under the WSRA, is protective of ORVs or satisfies the user capacity component of the required CMP. *See Friends of Yosemite*, 439 F. Supp. 2d at 1099-1100. NPS has a responsibility under the "protect and enhance" requirement of the WSRA to address both past and ongoing degradation. Setting interim limits to current capacity limits does not address the problem of past degradation.[5] Moreover, nowhere

---

[5]To illustrate the level of degradation already experienced in the Merced and maintained under the regime of interim limits proposed by NPS, we

has NPS shown how its interim limits place "primary empha-sis" on the protection of the Merced River's "esthetic, scenic, historic, archeologic, and scientific features" as required by § 1281(a). And although the WSRA does not preclude basing user capacity limits on current capacity limits, NPS's decision to base many of its interim limits on current capacity limits was not "founded on a reasoned evaluation of the relevant factors." *See Yosemite I*, 348 F.3d at 793 (internal quotation marks omitted). Nor has NPS "articulated a rational connec-tion between the facts found and the choice made." *See id.*[6]

## B.    Requirement of a Single, Self-contained Plan

**[6]** The district court did not err by faulting NPS for assum-ing that the 2000 CMP still existed and finding that the 2005 Revised Plan was deficient because, focusing only on the ele-ments that were explicitly struck down in *Yosemite I*, it was

---

need look no further than the dozens of facilities and services operating within the river corridor, including but not limited to, the many swimming pools, tennis courts, mountain sports shops, restaurants, cafeterias, bars, snack stands and other food and beverage services, gift shops, general merchandise stores, an ice-skating rink, an amphitheater, a specialty gift shop, a camp store, an art activity center, rental facilities for bicycles and rafts, skis and other equipment, a golf course and a dining hall accommo-dating 70 people. Although recreation is an ORV that must be protected and enhanced, *see* 16 U.S.C. § 1271, to be included as an ORV, according to NPS itself, a value must be (1) river-related or river dependant, and (2) rare, unique, or exemplary in a regional or national context. The multitude of facilities and services provided at the Merced certainly do not meet the mandatory criteria for inclusion as an ORV. NPS does not explain how maintaining such a status quo in the interim would protect or enhance the river's unique values as required under the WRSA.

[6]Our decision in *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630 (9th Cir. 2004), highlighted some of the problems with simply maintaining use at current levels. In examining compliance with the Wilderness Act, we stated that "[a]t best, when the Forest Service simply continued preex-isting permit levels, it failed to balance the impact that that level of com-mercial activity was having on the wilderness character of the land. At worst, the Forest Service elevated recreational activity over the long-term preservation of the wilderness character of the land." *Id.* at 647.

not a single, self-contained plan. *See Friends of Yosemite*, 439 F. Supp. 2d at 1093-94. The WSRA requires a single, comprehensive plan that collectively addresses all the elements of the plan—both the "kinds" and "amounts" of permitted use—in an integrated manner. As Friends argue, NPS has simply tacked onto the 2000 CMP ten indicators and standards for the purposes of limiting the "amounts" of use, but has failed simultaneously to address the appropriate "kinds" of use. Moreover, before the district court, NPS, in a futile effort to correct this problem, attempted to rely on a December 2005 "Presentation Plan" which, according to NPS, combines all elements from the 2000 CMP and the 2005 Revised Plan that comprise the management plan for the Merced as administered by NPS. The district court properly rejected any such reliance because it was created after the approval of the 2005 Revised Plan, was not presented for public review as the revised plan and contradicted the 2005 Revised Plan which states that it is "the" final revised CMP. *See id.* at 1094 n.2.

**[7]** In *Yosemite II*, we clarified that in *Yosemite I*, "we held . . . the entire Merced Wild and Scenic River [CMP] . . . invalid" and that "we did not otherwise uphold the [2000 CMP]." *Yosemite II*, 366 F.3d at 731 (internal quotation marks omitted). We thus concluded that, "[NPS] must prepare a new or revised CMP." *Id.* Contrary to NPS's assertion, in *Yosemite II*, we indicated that a single document covering all required elements must be produced. This does not mean that NPS is required to start from scratch with respect to each element of the 2000 CMP that was not explicitly found deficient or that it cannot incorporate parts of the 2000 CMP in preparing its new or revised plan. But, it is required to prepare a single plan, not issue supplemental volumes that simply cross-reference thousands of pages of material from the 2000 CMP.

The Secretarial Guidelines mandate such an interpretation of the WSRA, stating that the WSRA requires that a river's comprehensive management plan state both "the *kinds and amounts* of public use which the river area can sustain without

impact to the values for which it was designated." 47 Fed. Reg. at 39,458. NPS cannot, thus, address the "amounts" of use without also addressing the "kinds" of use. The two are inseparable. Further support comes from the plain meaning of "comprehensive," which, according to the Oxford English Dictionary, is "having the attribute of comprising or including much; of large content or scope."

NPS cites to *Federal Power Commission v. Idaho Power Co.*, 344 U.S. 17, 20 (1952), for the proposition that the district court's holding conflicts with principles of judicial review. In *Idaho Power*, the Supreme Court stated "that the function of the reviewing court ends when an error of law is laid bare. At that point the matter once more goes to the [agency] for reconsideration." *Id.* There, the D.C. Circuit had entered a judgment and remanded the case to the agency for entry of an order in accordance with its opinion. *Id.* at 19. However, in response to a motion to clarify the judgment, the appellate court entered a new judgment and itself undertook to modify the agency's order. *Id.* at 20 ("[T]he Court of Appeals entered a new judgment, stating that the order of the [agency] 'be, and it is hereby, modified by striking therefrom paragraph (F) thereof, and that the order of the [agency] herein as thus modified be, and it is hereby, affirmed.' "). When we required NPS to prepare a revised or new CMP, we did not commit the same error as the D.C. Circuit—we did not assume the responsibility of revising the 2000 CMP itself, but rather remanded to the agency. The same holds true for the district court with respect to its decision on the cross-motions for summary judgment. Thus, NPS's argument is without merit.

## C. The SEIS

The supplemental environmental impact statement ("SEIS") published as part of the 2005 Revised Plan examined four alternatives. Alternative 1 is the "no-action" alternative. It would have managed the river corridor under the 2000

CMP, but without the 2000 version of VERP. The three action alternatives each includes the revised version of VERP. Alternative 2, which the ROD adopted, includes the interim limits of the User Capacity Management Program which are based on the most part on current facility limits. Alternative 3 would have included all components of Alternative 2, but would have added a maximum daily visitor limit for each river segment, a maximum annual visitation limit of 5.32 million for the entire river corridor and a daily limit on the number of day hikers to Half Dome. The 5.32 million limit is higher than the highest level of visitation ever in Yosemite, which was 4.19 million in 1996. Alternative 4 would have again included all components of Alternative 2, but would have also established maximum use levels within each management zone, based on capacity factors for the average number of people per unit area, and would have imposed a maximum annual visitation limit of 3.27 million, which equals the parkwide visitation level in 1987.

### 1. "No-action" Alternative

**[8]** The district court correctly ruled that the SEIS did not set forth a true "no-action" alternative because the SEIS assumes, as the baseline, the existence of the 2000 CMP, which we previously found invalid. Such an assumption is logically untenable. The baseline alternative should not have "assume[d] the existence of the very plan being proposed." *Friends of Yosemite Valley*, 439 F. Supp. 2d at 1105. This is so even given the deference owed to the agency's choice of a "no-action" alternative and the ongoing nature of agency management.

**[9]** The "no-action" alternative should have included the elements from the 1980 GMP, the Wilderness Plan and other instruments such as the Superintendent's Compendium. However, including the 2000 CMP—even those elements of the CMP that we did not explicitly strike down—in the baseline

predetermines user capacity based on a plan that was held invalid. As the district court stated:

> [B]ecause the Ninth Circuit held the 2000 [CMP] to be illegal, NPS cannot properly include elements from that plan in the no action alternative as the status quo. . . . [A]t the time NPS was creating the no action alternative for the 2005 Revised Plan, the Ninth Circuit had explicitly held the entire 2000 [CMP] to be invalid, and *no comprehensive management plan for the Merced River existed*. The elements from the 2000 [CMP] which NPS includes as the status quo had to be implemented, if at all, in the 2005 Revised Plan. It was thus improper for NPS to refer to those elements as part of the status quo at the time the no action alternative was presented to the public. A no action alternative in an EIS is meaningless if it assumes the existence of the very plan being proposed.

*Id.* Thus, NPS's "no-action" alternative is invalid under NEPA.

## 2.   Range of Action Alternatives

**[10]** The district court correctly found that the SEIS lacked a reasonable range of action alternatives, and was thus unreasonably narrow, in violation of NEPA. The three action alternatives each included the revised version of VERP as the primary mechanism for dealing with user capacity, with a five year interim period while VERP is tested. Because the district court based its decision on the fact that each alternative relied on the revised VERP and because it is incorrect in its assessment of VERP, NPS argues that the court had no legitimate basis for finding that the SEIS lacked a reasonable range of action alternatives.

The action alternatives are the "heart" of an EIS. 40 C.F.R. § 1502.14. "The existence of a viable but unexamined alterna-

tive renders an environmental impact statement inadequate. An agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action, and sufficient to permit a reasoned choice." *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 729 (9th Cir. 1995) (internal citations and quotation marks omitted). Applying the "rule of reason" standard, we find that the range of action alternatives is unreasonably narrow because the alternatives are virtually indistinguishable from each other.

[11] First, each of the three action alternatives is primarily based on the VERP program which does not adequately address user capacity. Moreover, despite the supposed alternatives it proposed, NPS itself was aware that compliance with NEPA would require consideration of different means for addressing user capacity other than just VERP. For example, an NPS attorney advised that "VERP not be the only User Capacity framework analyzed in the Plan." As indicated in meeting notes, NPS recognized that "VERP is just a set of words . . . and [the public is] expecting us to look at other [user capacity] systems and they care about transparency." Perhaps most critically, NPS realized the "need for a reasonable range of user capacity alternatives *because the original EIS did not look at alternatives for implementing carrying capacity*." (emphasis added).

[12] Second, for the first five years, the interim limits proposed by the three alternatives are essentially identical. As indicated in NPS's meeting notes, "[a]ll alternatives start with levels of use consistent with current use levels." *see also Friends of Yosemite*, 439 F. Supp. 2d at 1099 ("These 'limits,' however, are simply the current physical capacity of the facilities in Yosemite Valley . . . ."). Although alternatives 3 and 4 also include maximum use levels and annual visitation limits, the action alternatives were not varied enough to allow for a real, informed choice. *See Yosemite I*, 348 F.3d at 800 n.2.

**IV.**

For the reasons stated, we conclude that the 2005 Revised Plan does not describe an actual level of visitor use that will not adversely impact the Merced's ORVs as required by *Yosemite I* and the WSRA. We further conclude that the WSRA requires that the CMP be in the form of a single comprehensive document, dealing with all the required elements, including both the "kinds" and "amounts" of use, and that, therefore, the 2005 Revised Plan is deficient because it only dealt with the two components that were struck down in *Yosemite I* and was not a single, self-contained plan. Finally, we conclude that the SEIS violates NEPA in both its "no-action" and action alternatives. We remand to the district court for further action consistent with this opinion.

In No. 07-15124, the government's appeal from the interlocutory injunction is **DISMISSED**. In No. 07-15791, the judgment of the district court is **AFFIRMED**.