# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY;
WESTERN LAND EXCHANGE PROJECT;
SIERRA CLUB,
        *Plaintiffs-Appellants,*

        v.

UNITED STATES DEPARTMENT OF THE
INTERIOR; BUREAU OF LAND
MANAGEMENT,
        *Defendants-Appellees,*

ASARCO LLC,
    *Defendant-intervenor-Appellee.*

No. 07-16423

D.C. No.
CV-01-01758-ROS

ORDER AND
OPINION

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, District Judge, Presiding

Argued and Submitted
February 10, 2009—San Francisco, California

Filed September 23, 2010

Before: Dorothy W. Nelson, William A. Fletcher and
Richard C. Tallman, Circuit Judges.

Opinion by Judge William A. Fletcher;
Dissent by Judge Tallman

16143

## COUNSEL

Roger Flynn, Jeffrey C. Parsons, WESTERN MINING ACTION PROJECT, Lyons, Colorado, for the appellants.

Edward S. Geldermann, Mark R. Haag, US DEPARTMENT OF JUSTICE, Washington, D.C., Cynthia M. Parsons, OFFICE OF THE U.S. ATTORNEY, Phoenix, Arizona; Norman Daniel James, FENNEMORE CRAIG PC, Phoenix, Arizona, for the appellees.

**ORDER**

This court's opinion filed September 14, 2009, and reported at 581 F.3d 1063, is withdrawn, and is replaced by the attached Opinion and Dissent.

The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing en banc, filed October 29, 2009, is DENIED. Judge Tallman voted to grant the petition for rehearing en banc.

No further petitions for rehearing or rehearing en banc will be accepted.

---

**OPINION**

W. FLETCHER, Circuit Judge:

The Center for Biological Diversity, the Western Land Exchange Project, and the Sierra Club (collectively, "Appellants") bring suit against Asarco LLC ("Asarco"), a mining company, and the Department of Interior and the Bureau of Land Management (collectively, "BLM"). Appellants contend that the BLM's approval of a land exchange violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-70; the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-87; and the Mining Law of 1872, 30 U.S.C. §§ 21-54.

If the proposed exchange does not occur, the land will continue to be owned by the United States. In that event, Asarco will be permitted to conduct mining operations on the land only if it complies with the Mining Law of 1872. Specifically,

Asarco will not be able to conduct a new mining operation on the land without first submitting a Mining Plan of Operations ("MPO") to the BLM. The MPO would have to include detailed information about the operations, management, monitoring, and environmental impacts of the proposed mining activities. The BLM would then have to approve the MPO before the new mining could proceed.

If the proposed exchange occurs, Asarco would take fee simple ownership of the exchanged land. In that event, Asarco's use of the land would not be subject to the requirements of the Mining Law of 1872. Asarco has spent sixteen years, and considerable amounts of time and money, seeking to achieve private ownership of the exchanged land, which would allow Asarco to avoid having to prepare the MPOs that are required so long as the land remains in public hands.

As part of the process of approving the land exchange, the BLM prepared a Final Environmental Impact Statement ("FEIS") pursuant to NEPA. In the FEIS, the BLM assumed without analysis that the MPO process would impose no constraints on, and would have no effect on, the manner in which Asarco would conduct new mining operations on the exchanged land. That is, the BLM assumed that the manner and extent of Asarco's new mining operations would be the same whether or not the United States owned the land. Because of this assumption, the BLM did not compare the environmental effects of exchanging the land with the effects of not exchanging the land.

Under these circumstances, we hold that the BLM has not "taken a 'hard look' at the environmental consequences of its proposed action" in violation of NEPA, and that its action was therefore arbitrary and capricious. *Blue Mountain Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998). We also hold that the BLM's approval of the proposed land exchange was a violation of FLPMA and similarly arbitrary and capricious. *Webb v. Lujan*, 960 F.2d 89, 91 (9th Cir.

1992). We therefore reverse the decision of the district court approving the actions of the BLM.

## I.    Background

Asarco owns and operates the Ray Mine complex in Gila and Pinal Counties, Arizona. The complex now includes a 265,000 ton-per-day open pit copper mine, a copper smelter with an acid plant, solution extraction/electrowinning plants, mills, concentrators, leaching systems, and related support facilities. Ore from the mine is transported eighteen miles to the Hayden Smelter for processing. In 1996, the complex produced 430 million pounds of copper anodes, over 70 million pounds of copper cathodes, 1.3 million ounces of silver in concentrate, and 623,000 tons of sulfuric acid. The Ray Mine is the second most productive copper mine in Arizona and the third most productive copper mine in the United States.

In 1994, Asarco proposed a land exchange with the BLM that would consolidate its holdings and expand its mining operations at the complex. As amended in 1997, the proposed land exchange would convey to Asarco in fee simple thirty-one parcels of public land totaling 10,976 acres (the "selected lands"). In return, Asarco would convey to the BLM eighteen parcels of private land totaling roughly 7,300 acres (the "offered lands"). FLPMA authorizes the Secretary of Interior to approve land exchanges. 43 U.S.C. § 1716.

The United States owns, and the BLM administers as full estates, 8,196 acres of the selected lands. The remaining 2,780 acres of the selected lands are owned and administered as "split estates." Asarco owns or is purchasing, in transactions not at issue in this appeal, the surface estate of these lands, while the United States owns and the BLM administers the mineral estate. Twenty-three of the thirty-one parcels of selected lands are located near the Ray Mine and the community of Ray, Arizona. Five of the parcels are located twelve to fifteen miles southeast of the Ray Mine, near the communi-

ties of Hayden and Winkleman, Arizona. The remaining three parcels are located about 50 miles west of the Ray Mine near the community of Casa Grande, Arizona.

The selected lands provide important wildlife and plant habitat, including high priority reintroduction habitat for desert bighorn sheep, 6,860 acres of endangered desert tortoise habitat, and potential habitat for threatened and endangered birds. Upland plant communities cover 99.2% of the selected lands and include riparian plant communities and three plant species designated for special status by the BLM. Some of the selected lands are immediately adjacent to the White Canyon Area of Critical Environmental Concern, and some are adjacent to or in close proximity to the White Canyon Wilderness. The selected lands include seventy-eight archaeological sites, of which forty are regarded as eligible for nomination to the National Register of Historic Places.

The selected lands are now encumbered by 751 mining claims or mill site claims under the Mining Law of 1872, of which 747 are held by Asarco. These claims are unpatented, and the BLM has not determined if they are valid. Every parcel of the selected lands except for Parcel CH-5 (comprising 480 acres) is encumbered by at least one such claim.

Asarco and the BLM are forthright in stating that they foresee the following five mining and mining-related uses for the selected lands following the land exchange. These uses are described, with specified acreage, in the FEIS as follows:

(1) Existing mining: 272 acres (2%) already have had and would continue to have substantial surface disturbance due to Asarco's mining operations.

(2) Production operations and support areas: 3,614 acres (33%) would be used to expand open pits, construct haul roads, and deposit solution-extraction rock. This would result

in substantial disturbance to between 25% and 100% of the land surface.

(3) Transition: 875 acres (8%) would be used as "raveling areas" around overburden and leach rock deposition areas, access roads, storm water diversion ditches, and administrative facilities. This would result in some disturbance to between 5% and 25% of the land surface.

(4) Intermittent use: 4,481 acres (41%) would not be subject to direct mining activity and would be used to consolidate Asarco's ownership and to buffer neighboring landowners from mining operations.

(5) Long-range prospect: 1,733 acres (16%) could be used for mine development and support in the future resulting in an unknown degree of surface disturbance.

The offered lands comprise five parcels or groups of parcels: the Knisely Ranch Parcels (160 acres), the Gila River Parcel (320 acres), the Tomlin Parcels (320 acres), the McCracken Mountain Parcels (6,384 acres), and the Sacramento Valley Parcel (120 acres). Following the land exchange, no mining claims would exist or be permitted on the Knisely Ranch Parcels. The BLM would petition to withdraw the Gila River Parcel and Tomlin Parcels from mineral entry, which, if successful, would mean that only persons who had established a valid mining claim before withdrawal would be permitted to mine on those parcels. *Clouser v. Espy*, 42 F.3d 1522, 1524-25 (9th Cir. 1994). The McCracken Mountain Parcels, which comprise 87% of the offered lands, and the Sacramento Valley Parcel would remain open to mineral entry. Of the 7,300 acres of offered lands, 1,126 acres exhibit moderate potential for locatable mineral resources, with the rest exhibiting low potential for locatable mineral resources.

The offered lands include riparian plant communities and important wildlife habitat, including habitat for some special

status species, potential habitat for some threatened or endangered species, including peregrine falcons, and proposed critical habitat for the cactus ferruginous pygmy owl. The offered lands include segments of the Gila River Riparian Management Area, the Black Mountains (Burro) Herd Management Area, the Cerbat (Wild Horse) Herd Area, the Big Sandy (Burro) Herd Management Area, and the McCracken Desert Tortoise Habitat Area of Critical Environmental Concern.

Between 1995 and 1997, the BLM consulted with various federal, state, and local agencies, elected representatives, non-governmental organizations, tribal governments, and private individuals concerning the land exchange. The BLM published a Draft Environmental Impact Statement ("DEIS") in October 1998.

In January 1999, after having reviewed the DEIS, the federal Environmental Protection Agency ("EPA") sent the BLM a three-page single-spaced letter accompanied by thirteen pages of single-spaced comments, vigorously objecting to the proposed land exchange. The EPA's letter stated, *inter alia*:

> Over the past several decades, approximately one billion tons of material have been excavated at the Asarco Ray complex. The proposed action would enable Asarco to excavate and process approximately three billion more tons over the next 40 years. In several meetings, letters, and conference calls with BLM since scoping for this project began in 1994, EPA has recommended that the DEIS provide certain information that we believe would be useful and relevant in a NEPA analysis for a land exchange where the foreseeable future uses of mining are known. *In our comment letter on the preliminary DEIS, we stated that the document did not appear to have evaluated all reasonable alternatives and strongly recommended that additional information regarding the alternatives be included in the*

*DEIS*. In that letter and several others to the DEIS, we also recommended that the potential impacts of the land exchange and the foreseeable future mining be discussed in much greater detail in the DEIS and specifically outlined the needed information.

*Although BLM has not received an acceptable mine plan of operations (MPO) from Asarco, it appears that Asarco has fairly specific plans for the selected parcels.* We believe that additional detailed information regarding geology, geochemistry, hydrology, and biological resources is relevant and necessary for this analysis to constitute full disclosure under NEPA. *It is also evident that all reasonable alternatives have not been evaluated and that impacts of foreseeable activities on the selected lands have not been sufficiently addressed in the DEIS. We are extremely dismayed that the BLM has ignored most of our recommendations in finalizing the DEIS* and are particularly troubled that the DEIS was published at a time when our headquarters office was still discussing the issues with BLM headquarters and the two agencies had not yet come to a resolution.

We have rated this DEIS as EO-2 — Environmental Objections-Insufficient Information. *We have strong objections to the proposed project because we believe there is potential for significant environmental degradation that could be corrected by project modification or other feasible alternatives. . . . We continue to contend that a substantial amount of information should be added to the EIS for BLM to meet its public disclosure obligation.*

(Emphasis added.)

Public hearings were held on the DEIS. The BLM received sixty-one comment letters or notifications of no comment

from interested individuals and groups. After reviewing and responding to these comments, the BLM issued its Final Environmental Impact Statement ("FEIS") in June 1999. The FEIS differed from the DEIS in only minor respects.

The FEIS analyzes the environmental, cultural, and socio-economic impacts of the proposed land exchange favored by Asarco ("the proposed exchange"); of the "Buckeye Alternative," under which the selected lands would decrease to 10,176 acres and the offered lands to 6,659 acres; of the "Copper Butte Alternative," under which the selected lands would decrease to 9,161 acres and the offered lands to 5,601 acres; and of the "No Action Alternative," under which no lands would be exchanged. The FEIS identifies, but elects not to study in depth, seven other alternatives.

The FEIS states that the "foreseeable uses of the selected lands are mining-related uses and *are expected to occur under all alternatives*." (Emphasis added.) In a section entitled "Actions Common to All Alternatives," the FEIS explains:

> This section describes actions that are common to all alternatives; that is, activities that would occur regardless of which alternative is selected. In developing alternatives, BLM concluded that foreseeable mining-related uses would likely occur whether any one of the land exchange alternatives were selected or the No Action alternative was selected. This is because a land exchange is not required for mining-related activities to take place on the selected lands. Asarco currently holds the vast majority of the mining claims on the public lands selected for exchange, and through these mining claims, Asarco has the right to pursue development on the selected lands for mining or mining-related uses.

The next paragraph contains a short, neutral description of the MPO process. The paragraph does not contain any discussion

of the manner in which the MPO process might alter mining operations. Then, on the next page, the FEIS states, "As explained above, foreseeable uses of the selected lands are *assumed to be the same for all alternatives.*" (Emphasis added.)

The BLM repeatedly stated in the FEIS its assumption that mining was the foreseeable use for the selected lands, and it repeatedly characterized the environmental impacts of mining operations, with or without the MPO requirement, as "common to all alternatives." *See*, *e.g.*, FEIS discussions of "Upland Plant Communities," "Riparian Plant Communities," "Wildlife/Wildlife Habitats," "State and BLM Special Status Species," "Biodiversity," "Surface Water," "Groundwater," "Surface Water Rights/Well Permits," "Air Quality," "Soils," "Access and Recreation." The BLM's assumption played a critical role in the FEIS. The FEIS contains only a single description of the environmental consequences of mining because the BLM assumed that they would be the same under every alternative. That is, because the BLM assumed that mining operations would be the same, the FEIS contains no comparative analysis of the environmental consequences of the land exchange and the no action alternative.

The federal EPA, the federal Bureau of Indian Affairs, and the Sierra Club objected to the FEIS. The BLM summarized their objection as follows: "A Mine Plan of Operation is necessary to complete analysis of the land exchange impacts. *BLM's assumption is wrong that the foreseeable use reflects mining that would take place whether or not land exchange occurs.*" (Emphasis added.) The ROD did not answer the objection. Instead, it referred the reader to the FEIS. It stated, "This issue has been addressed in the FEIS General Response section 7.4.5 and 7.4.6." In those sections of the FEIS, the BLM responded to the first sentence of the objection, stating that MPOs are not required for mining that is anticipated after the selected lands become privately owned. However, the BLM did *not* respond to the second sentence (italicized

above), which objected to the BLM's "assumption" that the same mining would occur with or without an MPO requirement.

In April 2000, the BLM issued a Record of Decision ("ROD") in which it did two things. First, the BLM amended two existing Resource Management Plans ("RMPs") to change the designation of the selected lands under FLPMA. It amended the 1988 "Phoenix RMP" to change the designation of 9,906 acres in the White Canyon Resource Conservation Area from "retention" to "disposal." And it amended the 1993 "Safford District RMP" to change the designation of 433 acres in the Long-Term Management Area from "retention" to "disposal." These changes in the Phoenix and Safford District RMPs were prerequisites to the conveyance of the selected lands from public ownership. As a consequence of these changes, the BLM would no longer be required to manage the selected lands as multiple-use lands under FLPMA.

Second, the BLM approved the proposed land exchange. Section 206 of FLPMA forbids land exchanges unless the "public interest will be well served." 43 U.S.C. § 1716(a). This section directs the Secretary of Interior to "give full consideration" to better land management and "needs for lands for the economy, . . . food, fiber, minerals, and fish and wildlife" when determining the public interest. *Id.* In part, the ROD justified the exchange by denying that any harm to the public would result from conveying the selected lands to private ownership. The ROD concluded that the public interest would not be harmed by the conveyance because it assumed, as the FEIS had assumed, that mining would be conducted in the same manner whether or not the exchange occurred. The ROD stated that "the BLM considers the continuation of mining as the foreseeable use of most of the selected federal lands whether the exchange occurs or not."

In July 2001, Appellants filed an administrative appeal and a request to stay the land exchange with the Interior Board of

Land Appeals ("IBLA"). When the IBLA failed to act on the Appellants' request within forty-five days as mandated by 43 C.F.R. § 4.21(b)(4), Appellants filed suit in federal district court. The IBLA then stayed the land exchange pending its disposition of the appeal, and the district court suspended its proceedings pending a decision from the IBLA.

In August 2004, the IBLA denied the Appellants' appeal. *Ctr. for Biological Diversity, et al.*, 162 I.B.L.A. 268 (2004). One Administrative Judge wrote separately, concurring in the result. For her, the difficult issue was whether the BLM had complied with NEPA. She wrote:

> *I am perturbed by BLM's assertion that foreseeable consequences of this exchange are not possible to predict or are speculative.* It appears that the record contains considerable information indicating where within the selected lands mineral resources are located and where they are not. It is this information that forms the basis for the classification of foreseeable uses ("existing," "production," "transition," "intermittent use," and "long-range prospect") identified for the selected lands in the FEIS. Further, BLM changed its land use designations for the vast majority of the selected lands in the Phoenix and Safford Resource Management Plans from "resource conservation area" and "long term management area" to "suitable for disposal" in the context of implementing this exchange decision. . . . *Combining these two points of information — the knowable classifications within the context of mining of the selected lands with the change in land designation — made foreseeable impacts more easily presentable in a manner not easily found in this EIS and less speculative than BLM suggests.*

*Id.* at 291 (Hemmer, Admin. J., concurring) (emphasis added) (internal citations omitted).

On June 6, 2007, the district court granted summary judgment to Appellees. Appellants timely appealed to this court.

## II.     Standard of Review

We review the district court's grant of summary judgment de novo. *United States v. Tacoma*, 332 F.3d 574, 578 (9th Cir. 2003). Under NEPA, "we must ensure that the agency has taken a 'hard look' at the environmental consequences of its proposed action. . . . [W]e must defer to an agency's decision that is 'fully informed and well-considered.' However, we need not forgive a 'clear error of judgment.' " *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998) (internal citations omitted). We review the BLM's compliance with NEPA under the deferential "arbitrary and capricious" standard of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A); *see The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc). We also review the BLM's compliance with FLPMA under the deferential "arbitrary and capricious" standard. *See Webb v. Lujan*, 960 F.2d 89, 91 (9th Cir. 1992).

## III.     Discussion

For the reasons that follow, we hold that the BLM's assumption that mining would occur on the selected lands in the same manner regardless of the land exchange was arbitrary and capricious, and that the BLM therefore violated NEPA. We further hold that the BLM's reliance on this assumption in the ROD to conclude that the proposed land exchange is in the "public interest" was arbitrary and capricious, and that the BLM therefore violated FLPMA.

### A.     NEPA

In NEPA, Congress recognized the "profound impact" of human activities, including "resource exploitation," on the environment and declared a national policy "to create and

maintain conditions under which man and nature can exist in productive harmony." 42 U.S.C. § 4331(a). To further this policy, NEPA "establishes 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences." *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989)). Chief among these procedures is the preparation of an environmental impact statement ("EIS").

[1] NEPA requires preparation of an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Every EIS must "provide [a] full and fair discussion of significant environmental impacts" of the proposed agency action. 40 C.F.R. § 1502.1. An EIS serves two purposes:

> First, [i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts. Second, it guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004) (internal quotation marks and citations omitted).

[2] In addition to the proposed agency action, every EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives" to that action. 40 C.F.R. § 1502.14(a). The analysis of alternatives to the proposed action is " 'the heart of the environmental impact statement.' " *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 531 F.3d 1114, 1121 (9th Cir. 2008) (quoting 40 C.F.R. § 1502.14). "The existence of reasonable but unexamined alternatives renders an EIS inadequate." *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998).

The FEIS prepared by the BLM examined the proposed land exchange and three alternatives: the Buckeye Alternative, the Copper Butte Alternative, and the No Action Alternative. Under the No Action Alternative, the exchange would not proceed, and the selected lands would remain in public hands. A no action alternative in an EIS allows policymakers and the public to compare the environmental consequences of the status quo to the consequences of the proposed action. The no action alternative is meant to "provide a baseline against which the action alternative[ ]" — in this case, the land exchange — is evaluated. *Id*. A no action alternative must be considered in every EIS. *See* 40 C.F.R. § 1502.14(d).

The BLM's assumption in the FEIS that the environmental consequences of the land exchange alternative and the no action alternative would be the same was arbitrary and capricious. The BLM based its assumption that mining would occur in the same manner on the fact that Asarco already holds mining claims on the selected lands. However, if the proposed land exchange does not occur, the selected lands would remain in public hands. In that event, Asarco's ability to conduct mining operations on its claims would be subject to the Mining Law of 1872. In contrast, if the proposed land exchange occurs, Asarco would own the selected lands in fee simple. In that event, Asarco's use of the land would not be subject to the requirements of the Mining Law. The BLM thus assumed that the Mining Law would have no impact on the manner in which Asarco will conduct mining if the selected lands remained public lands. A description of the operation of the Mining Law of 1872 shows why this assumption is arbitrary and capricious.

Asarco has a right to engage in mining on the selected lands under the Mining Law even if the exchange does not proceed, based on its 747 unpatented mining and mill site claims. *See, e.g.*, 30 U.S.C. § 612(a) (holders of unpatented mining claims can engage in "prospecting, mining or processing operations and uses reasonably incident thereto"); *United*

*States v. Shumway*, 199 F.3d 1093, 1105 (9th Cir. 1999) ("The owner of a mining or mill site claim does not need a patent, or a vested right to issuance of a patent, to possess and use the property."). But the manner and extent of that mining is likely to differ depending on whether the selected lands are owned by the United States as public lands or by Asarco as private lands in fee simple.

### 1.    The MPO Requirement

If the land exchange does not occur and the selected lands remain public, Asarco will be obliged to comply with the requirements of the Mining Law. Under that law, Asarco would have to submit Mining Plans of Operations ("MPOs") to the BLM before engaging in mining operations on its claims if those operations are greater than a "casual use" that would disturb more than five acres of land. *See* 43 C.F.R. §§ 3809.11, 3809.21. "Casual use means activities ordinarily resulting in no or negligible disturbance of the public lands or resources," such as collection of mineral specimens using hand tools. *Id.* § 3809.5. It is clear from the FEIS that Asarco intends to engage in mining operations on the selected lands that would be greater than casual use, and that one or more MPOs would be required.

Each MPO would have to provide a significant amount of information on Asarco's mining plans, including "maps . . . showing the location of exploration activities, drill sites, mining activities, processing facilities, waste rock and tailing disposal areas, support facilities, structures, buildings, and access routes"; "[p]reliminary or conceptual designs, cross sections, and operating plans for mining areas, processing facilities, and waste rock and tailing disposal facilities"; "[w]ater management plans"; "[r]ock characterization and handling plans"; "[q]uality assurance plans"; "[s]pill contingency plans"; "[p]lans for all access roads, water supply pipelines, and power or utility services"; reclamation plans that address "[d]rill-hole plugging," "[r]egrading and reshaping," "[m]ine

reclamation," "[r]iparian mitigation," "[w]ildlife habitat reha-bilitation," "[t]opsoil handling," "[i]solation and control of acid-forming, toxic, or deleterious materials," "[r]emoval or stabilization of buildings, structures and support facilities," and "[p]ost-closure management"; a detailed monitoring plan to ensure compliance with environmental laws and regula-tions; a "[r]eclamation cost estimate"; and "[o]perational and baseline environmental information," such as information on "geology, paleontological resources, cave resources, hydrol-ogy, soils, vegetation, wildlife, air quality, cultural resources, and socioeconomic conditions in and around the project area," as the BLM may request. *See id.* § 3809.401. The BLM may require information beyond that submitted with an initial MPO. "[I]nsofar as BLM has determined that it lacks ade-quate information on *any* relevant aspect of a plan of opera-tions, BLM not only has the authority to require the filing of supplemental information, it has the obligation to do so." *Great Basin Mine Watch*, 146 I.B.L.A. 248, 256 (1998).

Further, depending on the circumstances, the MPO process requires BLM to consult with other agencies. For example, the selected lands include dozens of archaeological sites, many of which, according to the FEIS, would be destroyed or severely disturbed by mining operations. Consequently, the BLM may have to perform the consultation required under the National Historical Preservation Act. *See* 43 C.F.R. § 3809.411(a)(3)(iii). Similarly, the BLM may have to per-form the consultation required under the Endangered Species Act and/or the Magnuson-Stevens Fishery Conservation and Management Act. *See id.* The BLM may also have to consult with Native American tribes. *See id.* § 3809.411(a)(3)(iv). It may also have to consult with the State of Arizona to ensure that Asarco — which in the past has violated the federal Clean Water Act at the Ray Mine Complex — complies with State water quality requirements. *See id.* § 3809.411(a)(3)(ix).

Still further, the MPO process requires the BLM to comply with NEPA. *See id.* § 3809.411(a)(3)(ii). NEPA requires the

preparation of an EIS before approving an MPO if the approval would constitute a "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Based on the uses that Asarco and the BLM foresee for the selected lands, as detailed in the FEIS, it is virtually certain that BLM approval of an MPO for the selected lands would constitute a "major federal action." Each EIS would have to provide detailed information on the environmental impacts of Asarco's planned mining as outlined in the MPO.

[3] Finally, the BLM cannot approve an MPO unless it complies with FLPMA. Under FLPMA, the Secretary of Interior is required to "take any action necessary to prevent unnecessary or undue degradation of the [public] lands." 43 U.S.C. § 1732(b). BLM regulations define "unnecessary or undue degradation" ("UUD") to mean "conditions, activities, or practices" that fail to comply with the "performance standards in [43 C.F.R.] § 3809.420," that fail to comply with "other Federal and state laws related to environmental protection and protection of cultural resources," that are "not 'reasonably incident' to prospecting, mining, or processing operations" as defined in 43 C.F.R. § 3715.0-5, or that "[f]ail to attain a stated level of protection or reclamation required by specific laws" in special status areas. 43 C.F.R. § 3809.5. FLPMA and its implementing regulations require the Secretary to "take any action necessary" to prevent UUD.

FLPMA's requirement that the Secretary prevent UUD supplements requirements imposed by other federal laws and by state law. *See id*. § 3809.415 ("You prevent unnecessary or undue degradation while conducting operations on public lands by . . . [c]omplying with § 3809.420, as applicable; the terms and conditions of your notice or approved plan of operations; *and* other Federal and State laws related to environmental protection and protection of cultural resources.") (emphasis added). Prevention of UUD includes designing access routes that minimize adverse environmental impacts,

§ 3809.420(b)(1); disposing appropriately of "tailings, dumps, deleterious materials or substances, and other waste," § 3809.420(b)(2); reclaiming disturbed areas, § 3809.420(b)(3); protecting fisheries, wildlife and plant habitat, § 3809.420 (b)(7); and performing appropriate leaching operations and impoundments, § 3809.420(b)(12). UUD requirements are distinct from requirements under NEPA. "A finding that there will not be significant impact [under NEPA] does not mean either that the project has been reviewed for unnecessary and undue degradation or that unnecessary or undue degradation will not occur." *Kendall's Concerned Area Residents*, 129 I.B.L.A. 130, 140 (1994).

In *Mineral Policy Center v. Norton*, 292 F. Supp. 2d 30 (D.D.C. 2003), plaintiffs challenged newly promulgated regulations, including § 3809.420, implementing the UUD mandate of FLPMA. Plaintiffs' central contention was that the new regulations were too weak to satisfy the statutory mandate of preventing UUD. The Department of the Interior ("Interior") responded by arguing that the regulations would satisfy the mandate, *in significant part because of the environmental protection provided by the MPO process*. The district court wrote, "Interior argues that it will protect the public lands from any UUD by exercising case-by-case discretion to protect the environment through the process of: (1) approving or rejecting individual mining plans of operation . . . ." *Id.* at 44. The BLM is, of course, part of Interior. It ill becomes Interior and the BLM to take the position in this litigation that the MPO process would not alter the manner of mining, and its environmental consequences, when Interior took precisely the opposite position in *Mineral Policy Center*.

## 2.   Comparative Analysis

**[4]** It is black letter law that NEPA requires a comparative analysis of the environmental consequences of the alternatives before the agency. In the case before us, that analysis would compare the environmental consequences of the no-action

alternative, in which Asarco would own mining claims on public land, and the proposed land exchange alternative, in which Asarco would own the land in fee simple. Under the first alternative, Asarco would have to prepare and receive approval for MPOs in accordance with the Mining Law. Under the second alternative, no MPOs would be required.

In its 1999 letter to the BLM, the EPA objected strenuously to the draft EIS. The EPA noted that "it appears that Asarco has fairly specific plans for the selected parcels," and the EPA "continue[d] to contend that a substantial amount of information should be added to the EIS for the BLM to meet its public disclosure obligation." In her 2004 separate concurrence in the IBLA's decision, Administrative Judge Hammer noted that she was "perturbed by BLM's assertion that foreseeable consequences of this exchange are not possible to predict or are speculative." She wrote that the information available to the BLM "made foreseeable impacts more easily presentable in a manner not easily found in this EIS and less speculative than BLM suggests." As described above, the FEIS itself contains detailed information about the mining activities that Asarco intends to conduct on the selected lands, as well as the acreage to be devoted to such activities. It is thus plain from the record that both Asarco and the BLM have a fairly detailed knowledge of what Asarco intends to do if the proposed exchange is approved.

[5] In the circumstances of the case before us, where it is obvious, as detailed in the record, that Asarco and the BLM know a great deal about Asarco's mining plans for the selected lands, NEPA requires a meaningful analysis of the different environmental consequences that would result from public ownership (with an MPO requirement) and private ownership (without an MPO requirement). This does not mean that the BLM must require, in connection with the preparation of the FEIS, that Asarco file full-fledged MPOs for the mining it will conduct on the selected lands. But it does mean that, based on the information now reasonably available, the

BLM must make a meaningful comparison of the environmental consequences of Asarco's likely mining operations with and without the requirement that MPOs be prepared by Asarco and approved by the BLM — that is, with and without the proposed exchange. In the absence of such a comparison in the FEIS, the BLM has not conducted the "hard look" that NEPA requires. Rather, the BLM has averted its eyes from what is in plain view before it.

**[6]** We therefore conclude that the BLM acted arbitrarily and capriciously, and violated NEPA, by failing to take a "hard look" at the likely environmental consequences of the land exchange.

## B.   FLPMA

In FLPMA, Congress declared that it is the policy of the United States to manage the public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8). Congress also declared it a national policy to manage the public lands "in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands." *Id.* § 1701(a)(12). The BLM and the Secretary of the Interior are responsible for administering FLPMA and satisfying this multiple use mandate.

**[7]** FLPMA forbids land exchanges unless the "public interest will be well served by making that exchange." *Id.* § 1716(a). FLPMA directs the Secretary of the Interior, in considering the public interest, to "give full consideration to better Federal land management and the needs of State and local people, including needs for lands for the economy, community expansion, recreation areas, food, fiber, minerals, and fish and wildlife." *Id.* The Secretary must also "find[ ] that the values and the objectives which Federal lands or interests to be conveyed may serve if retained in Federal ownership are

not more than the values of the non-Federal lands or interests and the public objectives they could serve if acquired." *Id.*

In approving the land exchange, the ROD emphasized what the BLM saw as the advantages of acquiring the offered land. Those advantages include: (1) facilitating better federal land management by acquiring private lands within special areas of designation that exhibit a "checker board" land ownership pattern; (2) improving wildlife and Area of Critical Environmental Concern habitats by adding parcels to federal protection and management; (3) supporting resource objectives for improving riparian zones by acquiring parcels along the Big Sandy and Gila Rivers; (4) continuing to support mining activities by providing lands that will enable Asarco to plan expansions, comply with environmental permits, buffer operations from surrounding lands, and continue operating on parcels with approved mining plans of operations; and (5) improving management of mineral rights.

[8] The ROD listed no disadvantages of conveying the selected lands into Asarco's private ownership. The ROD stated, "An additional rationale for approving the land exchange is that the BLM considers the continuation of mining as the foreseeable use of most of the selected federal lands whether the exchange occurs or not." In other words, the ROD, like the FEIS, assumed that mining would occur on the selected lands in the same manner whether or not the exchange took place. For the reasons discussed above, this assumption is unreasonable. The manner in which Asarco engages in mining on the selected lands is likely to differ depending on whether the land exchange occurs, and the environmental consequences will differ accordingly.

[9] Because the ROD unreasonably assumed that mining would occur in the same manner, its analysis of the public interest under FLPMA is fatally flawed. Without an accurate picture of the environmental consequences of the land exchange, the BLM cannot determine if the "public interest

will be well served by making the exchange," and the Secretary cannot determine if the "values and the objectives" which the selected lands "may serve if retained in Federal ownership are not more than the values" of the offered lands. We therefore hold that the conclusion in the ROD that the proposed land exchange is in the "public interest" within the meaning of FLPMA was arbitrary and capricious.

## C.    Resource Management Plans

In addition to approving the land exchange, the ROD approved changes to two Resource Management Plans ("RMPs"). First, it amended the Phoenix RMP by changing the designation of 9,906 acres of selected lands in the White Canyon Resource Conservation Area from "retention" to "disposal." Second, it amended the Safford District RMP by changing the designation of 433 acres of selected lands in the Long-Term Management Area from "retention" to "disposal." These changes were necessary in order to allow the conveyance of most of the selected lands into private hands.

Amending a resource management plan ordinarily constitutes "major federal action" requiring NEPA analysis. *See Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 560-62 (9th Cir. 2006). The BLM accordingly treated the plan amendments as major federal actions and analyzed them in the FEIS. As part of the no action alternative, the FEIS assumed that neither the land exchange nor the proposed amendments to the RMPs would take place.

**[10]** For the same reasons that the analysis in the FEIS of the land exchange is inadequate under NEPA, so too is the analysis of the proposed RMP amendments. By assuming that mining would occur in the same manner and to the same extent on the selected lands regardless of whether the exchange occurred, the BLM assumed either that the RMPs would be amended even if the exchange did not occur, or that even if the RMPs were not amended the existing RMPs would

not affect Asarco's mining plans. There is nothing in the record supporting the first assumption that the RMPs would be amended absent the exchange, especially given that the BLM acknowledges that the amendments were prerequisites to the land exchange. And the second assumption — that the unamended RMPs would have no effect on mining — suffers from the same flaws discussed above. Just as the BLM must consider the constraints imposed by the MPO requirement for the no action alternative to the land exchange, so too must it consider the constraints the RMPs would impose if the amendments did not occur. We note that 94% of the selected lands are currently subject to RMPs.

The Appellants did not directly challenge the RMP amendments in their appeal to us. However, we note the incongruity of holding that the analysis in the FEIS of the no action alternative violates NEPA with respect to the land exchange but not with respect to the RMP amendments if the same erroneous assumption infects them both. We leave it to the district court to address this issue, as appropriate, on remand.

#### D.   Mining Law of 1872

We do not reach the question whether the Mining Law of 1872 would be violated if the land exchange were to be effectuated on the current record.

#### E.   *Lands Council*

The dissent argues that our decision in this case is inconsistent with our recent en banc decision in *The Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) (en banc). We disagree.

We wrote in *Lands Council* that "our proper role is simply to ensure that the [agency] made no 'clear error of judgment' that would render its action 'arbitrary and capricious.' " *Id.* at 993. In *Lands Council*, we insisted that agencies support and

explain their conclusions with evidence and reasoned analysis. *Id.* at 994, 998.

*Lands Council* involved a challenge to a logging project proposed by the Forest Service. There were three NEPA issues. First, plaintiff Lands Council argued that the Forest Service had "fail[ed] to include a full discussion of the scientific uncertainty surrounding its strategy for maintaining species viability." *Lands Council*, 537 F.3d at 1002 (internal quotation omitted). Second, Lands Council argued that the Forest Service "did not cite adequate evidence that the Project will improve the habitat of old-growth species." *Id.* Third, Lands Council argued that the Forest Service "did not adequately examine adverse impacts from logging within old-growth stands." *Id.* We concluded that these three arguments failed and that the Forest Service had taken "the requisite 'hard look' at the environmental impacts of the Project." *Id.* at 1003.

The NEPA issue in the case now before us is quite different from the NEPA issues in *Lands Council*. Instead of alleged failures to discuss scientific uncertainty, to cite adequate evidence, or to examine adverse impacts, as in *Lands Council*, the issue in our case is a failure to make a meaningful comparison among alternatives before the agency. It is black-letter law under NEPA that such a comparison is required. *See* 40 C.F.R. § 1502.14 (As the "heart of the environmental impact statement," the EIS "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among the options by the decisionmaker and the public."). We so indicated in *Lands Council*: "The EIS must include statements on: . . . alternatives to the proposed action." *Lands Council*, 537 F.3d at 1001. We concluded in *Lands Council* that an adequate comparative analysis had been conducted. *Id.* at 1003.

There is nothing in the record supporting the BLM's assumption that the MPO process would make no difference

in the manner in which Asarco would perform mining operations on the selected lands. Instead, there is much in the record indicating precisely the opposite. We will not repeat here everything we have written above, but we note a few things.

We note that an "extremely dismayed" EPA objected to the draft EIS, complaining, "It is also evident that all reasonable alternatives have not been evaluated and that impacts of foreseeable activities on the selected lands have not been sufficiently addressed in the DEIS." The FEIS was not changed in response to this objection.

Further, we note that the EPA objected to the FEIS, writing that there was no support for the assumption that Asarco would mine in the same fashion whether or not it was required to prepare MPOs. The BLM failed to respond to this objection.

Still further, we note that in her concurring opinion for the IBLA, Administrative Judge Hammer pointed out that the record contains detailed information about the nature of Asarco's planned mining operations that "made foreseeable impacts more easily presentable in a manner not easily found in this EIS and less speculative than BLM suggests."

Finally, we note that the Department of Interior, of which the BLM is a part, successfully argued in *Mineral Policy Center* that MPOs provide meaningful environmental protection beyond that provided by other laws. In light of Interior's successful argument in *Mineral Policy Center*, we can hardly be expected to take at face value Interior's and the BLM's contrary argument, in the case now before us, that the MPO process provides no such environmental protection.

Our dissenting colleague makes a number of general statements. He says that we have "disingenuously" removed material from our prior opinion, Dissent at 16175; that we are

"attempting to mask [our] creation of a new substantive rule," *id.* at 16178; that we are "attempting to judicially legislate," *id.*; that we provide "selective and somewhat misleading presentation of the facts," *id.* at 16181 n.4; that our opinion "solely focuses on an isolated phrase from the record, taken entirely out of context," *id.* at 16186; that our "rumination is unaccompanied by any factual basis from the administrative record," *id.* at 16188; that we impose a "novel NEPA requirement steeped in mystery," *id.* at 16192; that we make a "false statement that the BLM failed to make a meaningful comparison," *id.* at 16192; that we "attempt to regulate agency action by judicial fiat," *id.* at 16193; that we "grossly overstep our role," *id.* at 16194; and that we "have sacrificed the integrity of our precedent and the best interests of the public," *id.* at 16200.

But our colleague has no response to the fact that an "extremely dismayed" EPA objected that the BLM did not perform an adequate environmental analysis in the draft EIS. His only response to the fact that the BLM did not reply to the EPA's statement that the FEIS was wrong in assuming that Asarco would mine in the same way, whether or not it prepared MPOs, is to quote language replying to another objection. His only response to the fact that Administrative Judge Hammer wrote a concurrence stating that the BLM possessed sufficiently detailed information to provide a more thorough environmental analysis is to point out that she was writing a concurrence. *Id.* at 16198-99 n.9. His only response to the fact that the position taken by Interior and the BLM in this litigation is flatly inconsistent with the position taken by Interior in *Mineral Policy Center* is to deny the existence of the inconsistency. *Id.* at 16188 n.6.

Our colleague states that the BLM found that the environmental consequences of the proposed exchange would be "similar" to those of the no-action alternative. He writes, "[T]he BLM reached the logical conclusion that, to the extent foreseeable, the environmental impacts would be in many

ways *similar* under the various alternatives." *Id.* at 16187 (emphasis added). He writes, further, "[The BLM's] expertise led it to believe that the environmental consequences would be *similar* whether Asarco mined on public or private land." *Id.* at 16188 n.6 (emphasis added). *See also id.* at 16188-89 ("ultimate mining-related activities would be substantially *similar*"); *id.* at 16188 n.6 ("the BLM's position here — that environmental impacts would be *similar* under the various alternatives"; *id.* ("The BLM's conclusion that Asarco's mining-related activities would be *similar*") (emphases added). Our colleague errs in so stating. The core problem in this case is that the BLM assumed that the environmental impacts of the proposed exchange and of the no action alternative would be "*the same*."

Our colleague writes that our opinion is "based on a distaste for the particular industrial goals at issue." Dissent at 16190. This is not true. We express no view — indeed, we have no view — on the question whether the proposed land exchange is a good or bad idea. That question is not properly before us. But our colleague has a very definite view. In his view, the land exchange is "beneficial." Dissent at 16176. In his view, the "offered lands . . . are undisputably superior in almost all respects (except for mineral deposits) to the selected lands." *Id.* at 16201. In his view, our approach in not only "legally untenable." *Id.* at 16201. It is also "impractical, misguided, and contrary to the best interests and welfare of the public at large." *Id.*

We confine ourselves to the legal questions before us. We continue to adhere to the standard of deference to agency action we articulated in *Lands Council*. But we are not compelled to defer — indeed, we are compelled *not* to defer — when an agency has acted arbitrarily and capriciously. In this case, we conclude that the BLM acted arbitrarily and capriciously in assuming without explanation that the MPO process is a meaningless formality that provides no environmental protection and, based on that assumption, in

failing to make a meaningful comparison between the proposed land exchange and the no action alternative.

## Conclusion

We conclude that the BLM acted arbitrarily and capriciously, in violation of NEPA and FLPMA, in assuming without explanation that Asarco would perform mining operations on the selected lands in the same manner regardless of the land exchange. In failing to perform a comparative analysis of the likely environmental consequences of the proposed land exchange, on the one hand, and the no action alternative, on the other, the BLM failed to take a "hard look" at the environmental consequences of the exchange in violation of NEPA. We hold further that the conclusion in the ROD that the proposed land exchange is in the "public interest" within the meaning of FLPMA was arbitrary and capricious because it was based on the BLM's flawed assumption.

We therefore REVERSE the decision of the district court approving the action of the BLM. We REMAND for further proceedings consistent with this opinion.

TALLMAN, Circuit Judge, dissenting:

It has been said that the life of a canary in a coal mine can be described in three words: short but meaningful. So, too, apparently was the life of our decision in *Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) (en banc).

With respect to my distinguished colleagues, the holding today undermines a congressionally authorized land exchange that, until now, has been approved at every stage of its fifteen-year history. The court's opinion is based on a fundamentally flawed reading of selective portions of a comprehensive record. The opinion then culminates in a novel and unwork-

able legal standard that not only effectively precludes these beneficial land exchanges between the federal government and private or public landowners, but also impairs the Bureau of Land Management's ("BLM") ability to effectively manage the public lands in a manner that furthers the public interest. Finally, the opinion gives no credence to the ability of the State of Arizona to manage lands under its regulatory jurisdiction, nor consideration to the substantial federal and state environmental, mining, and land use laws that will nonetheless be applicable whether or not the land exchange is approved.

In *Lands Council*, our en banc court confirmed the proper level of deference owed to agency determinations made within the agency's area of expertise. Nevertheless, my colleagues disregard that precedent and once again endeavor to impermissibly expand the scope of judicial oversight and scrutiny of agency action. Today's opinion is irreconcilable with *Lands Council*, which sought to rein in this type of judicial second-guessing in highly specialized areas.

# I

Though my colleagues, in their new amended opinion, disclaim any effort to determine how the Mining Law of 1872 (the "Mining Law"), 30 U.S.C. § 21 *et seq.*, might apply should the land transfer proceed, this case turns on the unique history of nearly 140 years of federal encouragement of mining on public lands. That seminal statute cannot be disregarded in deciding whether the agency decision can withstand judicial scrutiny. Congressional intent to benefit the country and insure its economic prosperity are completely ignored by the majority in its attempt to inject its views on how these lands should be administered. The revised opinion disingenuously removes the old opinion's "super-Mining Plan of Operations" ("MPO")[1] requirement, *see Ctr. for Biological*

---

[1]Before engaging in mining operations beyond casual use on public land, a claim holder must submit an MPO for consideration and approval

*Diversity v. U.S. Dep't of the Interior*, 581 F.3d 1063, 1074 (9th Cir. 2009), and now simply declares that the BLM's comparison between the land exchange and no-action alternatives was insufficient. But this requirement for some undefined additional comparison is just the previous judicially declared quasi-MPO requirement in disguise.

The underlying environmental challenge in this case seeks to overturn the approval of a mutually beneficial land exchange involving federal and non-federal parcels in southern Arizona (the "Land Exchange") between the BLM, an agency within the U.S. Department of the Interior, and Asarco LLC ("Asarco"), a private mining company that already possesses significant mining rights on the public land to be traded. The Mining Law establishes Asarco's existing mining rights to the selected lands whether owned in fee simple or not.[2] The Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*, governs the management of federal lands and sets congressional policy authorizing the agency to enter into land exchanges with public or private landowners. The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, is a procedural mechanism for assessing their environmental impact, which the BLM must consider in determining whether to approve a land exchange under FLPMA.

---

by the BLM. 43 C.F.R. § 3809.11. An MPO sets forth detailed explanations of the scope and impact of mining activities that will exceed a certain size. *See* Amend. Maj. Op. at 16161-62 (quoting 43 C.F.R. § 3809.401 extensively).

[2]As in the majority opinion, "selected lands" refers to the 10,976 acres of public land at issue, and "offered lands" refers to the 7,300 acres of private land currently owned by Asarco subject to the Land Exchange. The offered lands are comprised of eighteen parcels located in Pinal and Mohave Counties and include: (1) the Gila River Parcel at Cochran, (2) the Sacramento Valley Parcel, (3) the Knisely Ranch parcel group, (4) the Tomlin parcel group, and (5) the McCracken Mountains parcel group.

By beginning its analysis and focusing almost exclusively on NEPA, then working backward to discuss FLPMA only tangentially, while omitting the Mining Law entirely, the court's opinion inverts the legal analysis, reaches the wrong result, and, in doing so, creates bad law. With a single exception, the majority does not contest the thoroughness of the Environmental Impact Study ("EIS" or "FEIS") prepared in accordance with NEPA or the sound reasoning of the BLM's Record of Decision ("ROD") approving the Land Exchange. In my colleagues' minds, however, that single exception forms the linchpin of the NEPA and FLPMA analyses, and is alone sufficient to undermine a complicated agency decision and to grant the request by Appellants Center for Biological Diversity, Western Land Exchange Project, and Sierra Club (collectively, "CBD") to block the exchange.

The court's opinion makes a series of fundamental missteps. First, the majority appears to believe that "Asarco has spent sixteen years, and considerable amounts of time and money, seeking to achieve private ownership of the exchanged land" merely so that it can "avoid having to prepare the MPOs that are required so long as the land remains in public hands." Amend. Maj. Op. at 16148. That unfounded assumption totally misapprehends why both private and government landowners engage in congressionally authorized land exchanges. It also misapprehends our role as judges, which is to examine a government agency's decision to determine whether it is arbitrary and capricious, not to prognosticate on suspected ulterior motives of non-governmental participants in federal land exchanges.

Second, the opinion adopts a misguided view of the record —one pressed by CBD's briefing—that, for the purposes of considering the environmental impacts of the Land Exchange, the BLM blindly assumed that the type, scope, and intensity of Asarco's mining and mining-related activities on the selected lands would be exactly the same whether or not the Land Exchange occurred. *Id.* at 16154-55. The majority then

concludes—an apparent finding of fact for the first time on appeal—that "both Asarco and the BLM have a fairly detailed knowledge of what Asarco intends to do if the proposed exchange is approved," but the BLM has wrongfully chosen not to require an MPO incorporating that knowledge into its analysis of the Land Exchange. *Id.* at 16165.

Building upon the shaky foundation of these two highly questionable appellate assumptions, the majority, without identifying supporting authority, construes NEPA beyond its proper bounds to erect a procedural hurdle henceforth applicable to the land exchange approval process: Whenever a landowner proposes an exchange for public land on which it already holds mining rights, NEPA requires that the landowner effectively exercise those mining rights by engaging in some type of not quite "full-fledged" MPO environmental consequence comparison process. *Id.* at 16165-66.

The court does not specify exactly what would need to be done to meet the requirements of NEPA under these circumstances. It insists that there is no need for Asarco to "file full-fledged MPOs for the mining it will conduct on the selected lands," but states that the BLM must compare "the environmental consequences of Asarco's likely mining operations with and without the requirement that MPOs be prepared by Asarco and approved by the BLM." *Id.* But that is exactly what the BLM already did in this case. By amending its original opinion to remove the express requirement that Asarco file an MPO before the BLM may approve the sale, the majority is simply attempting to mask its creation of a new substantive rule. The majority's insistence that this is not a new rule does not make the effect of this ruling any less real.

Notwithstanding the standards set by Congress and our recent decision in *Lands Council*, my colleagues are attempting to judicially legislate, ostensibly through NEPA, an additional procedural requirement that necessarily imposes considerable substantive burdens on the parties. We were

reversed by the Supreme Court in *Weinberger v. Catholic Action of Hawaii/Peace Education Project*, 454 U.S. 139 (1981),[3] when we read NEPA to require the Navy to prepare a hypothetical EIS based on assumptions regarding the operations of a facility capable of storing nuclear weapons. *Id.* at 145 (explaining that the "Court of Appeals in this case should have accepted the balance struck by Congress, rather than engrafting onto the statutory language unique concepts of its own making"). My colleagues repeat this error here. It would not fool the canary.

To add a final overburden to the new procedure, the court eschews any attempt to opine whether the Land Exchange, even if it complied with the majority's new "quasi-MPO" requirement, would violate the Mining Law of 1872. This guarantees yet another round of expensive appeals, delaying for many more years the completion of the Land Exchange.

Applying this novel, judicially-created NEPA requirement to its interpretation of the record, the majority, with a few strokes of the pen, invalidates a Land Exchange that the BLM determined was in the public's best interest following careful and comprehensive evaluation. My colleagues reject without comment the sound reasoning of the BLM Arizona State Director, the Interior Board of Land Appeals ("IBLA"), and the district court—all of whom considered and rejected the same legal challenges presented by CBD—and conclude that the agency failed to take a "hard look" at the potential environmental consequences of the proposed action in violation of NEPA. For the same reason, they also summarily reject as arbitrary and capricious the BLM's "public interest" determination pursuant to FLPMA—a determination based almost exclusively on other considerations.

---

[3]In *Weinberger*, the Court reversed our panel opinion in *Catholic Action of Hawaii/Peace Education Project v. Brown*, 643 F.2d 569 (9th Cir. 1980).

I strongly disagree with this conclusion as well as with my colleagues' methodology in crafting the result. We should reject the arguments presented by CBD, and affirm the district court's order of summary judgment in favor of Asarco and the BLM, because the BLM reasonably concluded that the Land Exchange is in the best interests of the public.

## II

FLPMA sets forth the principles governing the management of lands owned by the United States and administered by the Secretary of the Interior through the BLM. The congressionally delegated authority is broad. Section 206 of FLPMA authorizes the BLM to exchange certain public lands for state, county, or private lands within the same state when it determines that "the public interest will be well served by making that exchange." 43 U.S.C. § 1716(a). That is, "giv-[ing] full consideration to better Federal land management and the needs of State and local people, including needs for lands for the economy, community expansion, recreation areas, food, fiber, minerals, and fish and wildlife[,]" the BLM determines whether "the values and the objectives which Federal lands or interests to be conveyed may serve if retained in Federal ownership are not more than the values of the non-Federal lands or interests and the public objectives they could serve if acquired." *Id.* Environmental impact is certainly a factor, and unquestionably an important one, in the BLM's "public interest" determination under FLPMA. NEPA establishes the procedures by which agencies must consider the environmental impacts of agency action, but does not dictate substantive results. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989).

Public land exchanges frequently benefit everyone involved in the transfer—the federal government, the exchanging public or private property owner, and, most importantly, the public at large. Exchanges are typically employed, as is proposed here, to eliminate patchwork ownership of isolated parcels.

Once consolidated, such lands can be managed efficiently, effectively, and economically for all sorts of beneficial uses— creation of parklands, wilderness areas, hiking and biking trails, environmental remediation and protection, or improved stewardship of multiple-use lands and forests. It is undisputed that the Land Exchange at issue would serve these very purposes, among others.[4]

What is unusual about these particular types of land swaps is the overlay of congressionally authorized mineral exploration and extraction rights in federal lands to which the miner —in this case, Asarco—needs no title. Asarco's preexisting mining rights under the Mining Law therefore lie at the core of this agency action.

The Mining Law states that "all valuable mineral deposits in lands belonging to the United States . . . shall be free and open to exploration," 30 U.S.C. § 22, and, stated generally, authorizes and governs prospecting and mining for economic minerals on federal public lands. It was designed to encourage individuals to "prospect, explore and develop the mineral resources of the public domain through an assurance of ultimate private ownership of the minerals and the lands so developed." *United States v. Curtis-Nev. Mines, Inc.*, 611 F.2d 1277, 1281 (9th Cir. 1980); *accord United States v. Shumway*, 199 F.3d 1093, 1098-99 (9th Cir. 1999) ("The min-

---

[4]Despite the majority opinion's selective and somewhat misleading presentation of the facts, the record reveals—and CBD does not contest—that from an environmental standpoint, the selected lands are far inferior to the offered lands that would come under federal ownership through the Land Exchange. As stated in the record, "The BLM prepared a careful and reasonable analysis of the natural resources lost and gained in the proposed land exchange. . . . In each instance, the natural resource inventory detailed in the FEIS [demonstrates that] the offered lands presented evidence of superior resource values compared to the selected land parcels." Moreover, the less environmentally valuable selected lands, which are comprised of scattered parcels that largely border the active Ray Mine Complex, are apparently rich in copper and silver—minerals in high demand by our technology-driven economy.

ers' custom, that the finder of valuable minerals on government land is entitled to exclusive possession of the land for purposes of mining and to all the minerals he extracts, has been a powerful engine driving exploration and extraction of valuable minerals . . . .").[5]

Under the Mining Law, all citizens have the right to enter public lands open to mineral entry and locate mining claims or mill site claims. *Independence Mining Co. v. Babbitt*, 105 F.3d 502, 506 (9th Cir. 1997). Once a claim is staked, the holder "has the exclusive right to possession and enjoyment of all the surface included within the lines of the locations, but the United States retains title to the land. This possessory interest entitles the claimant to 'the right to extract all minerals from the claim without paying royalties to the United States.' " *Id.* (quoting *Swanson v. Babbitt*, 3 F.3d 1348, 1350 (9th Cir. 1993)) (internal citation omitted). "If a discovery of a 'valuable mineral deposit' is made, the claim can be held indefinitely so long as the annual assessment work is performed, the necessary filings are made, fees are paid, and a valuable mineral deposit continues to exist." *Id.* It is well-established that "[t]he owner of a mining claim owns property, and is not a mere social guest of the Department of the Interior to be shooed out the door when the Department chooses." *Shumway*, 199 F.3d at 1103; *accord United States v. Locke*, 471 U.S. 84, 86 (1985) ("[A]n unpatented mining claim remains a fully recognized possessory interest."). In other words, a mining claim, without more, still involves significant mining rights.

The holder of a mining claim may apply for a patent to the land under 30 U.S.C. § 29, which, if issued, conveys fee title to the public land in favor of the claim holder. *See Curtis-Nev. Mines*, 611 F.2d at 1281. This process is called "patenting" or

---

[5]The Mining Law codified the informal system of acquiring mining claims on public land by prospectors in California and Nevada from the late 1840s through the 1860s. *See Shumway*, 199 F.3d at 1097-99.

proving the claim and requires a determination whether the claim is valid; i.e., whether "there was a legitimate discovery of a valuable mineral deposit on the land which a prudent man would be justified in developing." *Id*. Patenting, however, is not required to develop a claim or to engage in mining or related activities on public land. A claim holder can conduct "prospecting, mining or processing operations and uses reasonably incident thereto" without ever obtaining a patent. 30 U.S.C. § 612(a); *Curtis-Nev. Mines*, 611 F.2d at 1281-82 ("[C]laimants could continue mining activities on the claims, without ever obtaining a patent. As a practical matter, mining claimants could remain in exclusive possession of the claim without ever proving a valid discovery or actually conducting mining operations.").

Mining activities are always subject to governmental oversight and regulation and must comply with a panoply of federal, state, and local laws, including the Clean Air Act, the Clean Water Act, and the Solid Waste Disposal Act, among myriad other regulatory requirements. *See* 43 C.F.R. § 3809.420. Before engaging in mining operations beyond casual use on public land, a claim holder must submit a proposed plan of operation, an MPO, for consideration and approval by the BLM, *see id.* § 3809.11—a point upon which the majority improperly fixates. Unless "unnecessary or undue degradation of public lands" is found to result from the proposed operation, the BLM will approve a properly filed MPO. *Id.* § 3809.411(d).

With the exception of a single 480-acre parcel, the totality of the 10,976 acres that comprise the selected lands is completely encumbered by at least one of 751 mining or mill site claims. Asarco holds 747 of these claims. Accordingly, Asarco's ability to develop its claims on the selected lands and to engage in mining activities and activities incident to mining is firmly established under the Mining Law, predates the Land Exchange proposal, and will continue to exist whether the Land Exchange goes forward or not. It is with this practicality

in mind that we should review the BLM's decision to approve the Land Exchange.

## III

The Administrative Procedure Act provides the authority for our review, and we may only set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006). We have held that an agency's decision may only be called arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1448 (9th Cir. 1996) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "This inquiry must be searching and careful, but the ultimate standard of review is a narrow one," *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks omitted), and "we do not substitute our judgment for that of the agency," *Lands Council*, 537 F.3d at 987 (brackets omitted).

Having carefully reviewed and evaluated the record, I cannot agree with the majority's conclusion that, after fifteen years of consideration and the compilation of a dense administrative record that includes thousands of pages of study and thorough analysis, the BLM shirked its duty to take the requisite "hard look" under NEPA or otherwise acted arbitrarily or

capriciously. The law simply does not support the majority's holding, nor does the record.

## A

In considering the proposal, the BLM prepared a draft EIS pursuant to NEPA and, after providing for public review and comment, issued a final EIS in 1999. The BLM had initially considered a variety of alternatives, including the Land Exchange as proposed, various partial exchanges, a No Mining Alternative, and a No Action Alternative (i.e., where the Land Exchange was not approved and the selected and offered lands remained under present ownership, subject to the mining claims which encumber them). For various reasons, the original list of eleven alternatives was narrowed to four that warranted more in-depth study: the Proposed Action, the No Action Alternative, the Buckeye Alternative, and the Copper Butte Alternative.

Among the initially proposed alternatives eliminated from more detailed consideration was the No Mining Alternative. The BLM reasonably explained:

> [I]n developing alternatives, BLM concluded that foreseeable mining-related uses of the selected lands are actions common to all alternatives; that is, mining/mine-support uses would likely occur whether any one of the land exchange alternatives were selected or the No Action alternative was selected. This is because a land exchange is not required for mining-related activities to take place on the selected lands. Asarco currently holds the vast majority of the mining claims on the public lands selected for the exchange, and through these mining claims, Asarco has the right to pursue development on the selected lands for mining and mining-related uses.

As the EIS further explained, "[t]he foreseeable uses of the selected lands are mining-related uses and are expected to occur under all alternatives. Mining could occur on private . . . lands under a land exchange, on public lands subject to BLM's 43 CFR 3809 regulations, or through patenting under the Mining Law of 1872."

The BLM's assumption that the foreseeable use of the selected lands will involve mining-related activities irrespective of the Land Exchange is well supported by the record and common sense. Not even CBD disputes this conclusion. As noted by the BLM, Asarco already operates on approximately 272 acres of the selected lands pursuant to its mining claims, and four other copper mines in the area are considering expansion of their mining operations into the selected lands. Indeed, the close proximity of the selected lands to the Ray Mine Complex—the third most productive copper mine in the United States, which has been in operation for eighty-five years—coupled with Asarco's existing rights under the Mining Law and its stated intention to engage in mining activities on the selected lands whether or not the Land Exchange is effectuated, makes this the only reasonable conclusion.

To be fair, my colleagues do not dispute this general conclusion regarding the foreseeability of mining activities or propose a competing, alternative foreseeable use of the selected lands. Nor could they. Rather, their complaint lies in a misreading of the BLM's careful analysis, which infects the majority's view of the EIS and the ROD. My colleagues adopt a more drastic position, repeatedly faulting the BLM for simply presuming that mining operations would be "*the same for all alternatives*," whether or not there was a land exchange. Amend. Maj. Op. at 16155; *see also id.* at 16148, 16155, 16156, 16157, 16158, 16160, 16167, 16168, 16169, 16170-71, 16172-73. 16174. This logical leap distorts the BLM's reasoned analysis. As Asarco correctly asserted at oral argument, the BLM did no such thing.

In favor of its premise, the majority solely focuses on an isolated phrase from the record, taken entirely out of context. In the section discussing the "Alternatives Considered," the EIS states: "As explained above, foreseeable uses of the selected lands are assumed to be the same for all alternatives." Read in the correct context of developing and evaluating alternatives, the statement simply reiterates the unremarkable notion that mining activities would likely occur on the selected lands under all possible alternatives (and that the No Mining Alternative was neither feasible nor realistic)—a point that no one disputes. The majority, however, implies that the entire explanation is contained in a single isolated paragraph, rather than throughout the EIS and the ROD. *See id.* at 16155-56. My colleagues are then free to characterize the BLM's environmental analysis as unreasoned and inadequate. *See id.* That is simply not the case.

The manner and intensity of mining and mining-related activity pose an entirely distinct question from whether mining will likely occur on the selected lands. The EIS does not reveal an unwarranted presumption on the part of the BLM that the actual operations would be identical whether or not the Land Exchange is approved. Rather, given Asarco's representations, the BLM conducted its environmental assessment —a comparative analysis—under the assumption that mining-related activity on land remaining under federal ownership would be conducted in a manner consistent with Asarco's existing mining rights under the Mining Law and a host of otherwise applicable federal and state environmental regulations. *See Lands Council*, 537 F.3d at 1003 ("[W]e will not find a NEPA violation based on the [agency]'s use of an assumption that we approve."). Because Asarco already holds mining claims to nearly all of the selected lands, the BLM reached the logical conclusion that, to the extent foreseeable, the environmental impacts would be in many ways similar under the various alternatives. Based on the facts of this case, there is nothing improper or even surprising about this reasoning. Indeed, a contrary conclusion would be absurd.

The majority, however, seems focused on the hypothetical, noting that "[t]he manner in which Asarco engages in mining on the selected lands is likely to differ depending on whether the land exchange occurs, and the environmental consequences will differ accordingly." Amend. Maj. Op. at 16167. Of course, the manner in which Asarco's future mining will occur is dependent on a variety of factors. Mining activities would differ if the worldwide price of copper plummeted, or if particular parcels of land did not contain sufficient quantities of minerals to warrant mining at all. However, the majority's rumination is unaccompanied by any factual basis from the administrative record. Nor do my colleagues disclose how the inevitable mining activities might materially differ. It is of course axiomatic that NEPA does not encompass all conceivable scenarios. *See Weinberger*, 454 U.S. at 146 ("[A]n EIS need not be prepared simply because a project is *contemplated*, but only when the project is *proposed*.").

But even assuming the selected lands remained publicly owned, given the facts of this case (namely, Asarco's continuing mining rights on the selected lands), there is nothing unreasonable or illogical about a conclusion that, while the timing might differ, the ultimate mining-related activities would be substantially similar and in turn result in comparable environmental impacts. On the contrary, in light of the variables in play, that conclusion is quite sound.[6] My col-

---

[6]The majority asserts that the BLM's position here—that environmental impacts would be similar under the various alternatives whether or not MPOs are filed—is inconsistent with the position it took in *Mineral Policy Center v. Norton*, 292 F. Supp. 2d 30 (D.D.C. 2003). *See* Amend. Maj. Op. at 16164, 16171. That is simply untrue, and its chastisement of the Department of the Interior is inappropriate. In Mineral Policy Center, the BLM argued that the MPO process allows it to exercise case-by-case discretion, which is one of many tools used to protect the environment with regard to mining operations on public lands. 292 F. Supp. 2d at 44 (citing, *inter alia*, the Endangered Species Act, 16 U.S.C. §§ 1531-1534; the Archeological Resources & Protection Act, 16 U.S.C. §§ 470aa-470mm; the Clean Water Act, 33 U.S.C. §§ 1251-1387; and the Comprehensive

leagues' position is premised on an inflated portrayal of the MPO process. Given the substantial rights and interests provided by the Mining Law and its goal of encouraging the location and extraction of valuable minerals, the BLM's review of a claim holder's proposed MPO is limited. The BLM may disapprove or withhold approval of a properly submitted MPO concerning an area open to mining only if a proposed operation "would result in unnecessary or undue degradation of public lands." 43 C.F.R. § 3809.411(d)(3); *see* 43 U.S.C. § 1732(b). "A reasonable interpretation of the word 'unnecessary' is that which is not necessary for mining. 'Undue' is that which is excessive, improper, immoderate or unwarranted." *Utah v. Andrus*, 486 F. Supp. 995, 1005 & n.13 (D. Utah 1979) (noting that "[t]he word 'impair' would prevent many activities that would not be prevented by the language of 'unnecessary or undue degradation' ").

The BLM is, for example, "under no legal obligation to determine mining claim or mill site validity before approving a proposed plan of operations to explore for or develop minerals on lands open to the Mining Law's operation." Legal Requirements for Determining Mining Claim Validity Before Approving a Mining Plan of Operations, Op. DOI Solicitor General, M-37012 (Nov. 14, 2005); *see W. Shoshone Def. Project*, 160 IBLA 32, 56 (2003) ("BLM generally does not determine the validity of the affected mining claims before approving a plan of operations.").[7] If the BLM finds no

---

Environmental Response, Control & Liability Act, 42 U.S.C. §§ 9601-9675). That statement is not inconsistent with the BLM's reasoning in this case. The BLM's conclusion that Asarco's mining-related activities would be similar even without the MPO process does not mean that the MPO process is generally meaningless. It simply shows that when the BLM looked into the necessarily uncertain future in examining this particular land exchange, its expertise led it to believe that the environmental consequences would be similar whether Asarco mined on public or private land.

[7]As the majority asserts, the MPO review process does trigger procedures established by the BLM and will typically involve an environmental analysis subject to NEPA. *See* 43 C.F.R. § 3809.411(c). Still, the limited "unnecessary and undue degradation" standard governs the MPO approval process, and NEPA operates within these restraints.

unnecessary and undue degradation, and the claim holder has obtained all required permits, the BLM must authorize the planned mining operations.

Indeed, it is the majority—not the BLM—that has engaged in improper conjecture and has adopted unfounded presumptions. Substantial governmental regulations—such as the Clean Air Act, the Clean Water Act, and various other federal and local safeguards—remain applicable to operations on private land. Today's opinion, based on a distaste for the particular industrial goals at issue, requires that courts presume that in the absence of the MPO process, mining companies will conduct their activities unsupervised by any environmental regulator in a manner that unnecessarily and unduly degrades the environment. And, in doing so, my colleagues assume that mining companies will somehow evade the substantial state and federal governmental regulations that remain applicable to mining operations on private land in Arizona.

But it gets much worse. Here, because Asarco has neither engineered nor submitted an MPO for the selected lands, a foreseeable use plan was instead developed by the BLM as the basis for analyzing the land exchange proposal and the potential environmental consequences. As the BLM Arizona State Director noted in the Protest Decision, rejecting CBD's arguments:

> BLM considered future mining as allowed by the Mining Law, subject to full compliance with 43 C.F.R. Part 3809, as the foreseeable use under all exchange alternatives and the no-action alternative. . . . Based upon a foreseeable use plan (FEIS 2.2; Tables 2-5, 2-6; Figures 2-7, 2-8, 2-9), BLM analyzed the direct, indirect and cumulative impacts of future mining within the limits of the information available. . . . BLM also identified how mining development by Asarco requires other major environmental permits under the jurisdiction of other

> federal and state agencies (FEIS, Section 1.6.4 and Table 1-5), whether or not the lands remain federal or in private ownership.

While not an MPO approved in accordance with the "unnecessary or undue degradation" standard, the foreseeable use plan developed for the Land Exchange reasonably approximated Asarco's planned mining-related activities and considered the ongoing regulation of anticipated mining activities whether or not the exchange was approved. *Cf. Am. Rivers v. FERC*, 201 F.3d 1186, 1195 (9th Cir. 1999) ("[O]nce we are satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, our review is at an end." (internal quotations and brackets omitted)). The BLM plainly stated: "Mining plans of operations are not required for a land exchange proposal."

This, however, is not enough for the majority. My colleagues fault the BLM for failing to comply with obligations newly created in this opinion. After all, they do not, nor could they, challenge the BLM's environmental impact analysis in light of the information at hand. Recognizing that detailed findings cannot be drawn from nonexistent information about future events not yet planned, my colleagues impose their view of what steps the BLM should take under NEPA whenever preexisting mining rights are involved, even where actual mining is speculative or the contours of planned mining activities are undefined. The opinion proclaims that, to satisfy NEPA, "the BLM must make a meaningful comparison of the environmental consequences of Asarco's likely mining operations with and without the requirement that MPOs be prepared by Asarco and approved by the BLM . . . ." Amend. Maj. Op. at 16145. As discussed extensively above, that is exactly what the BLM did in this case.

In holding that the BLM failed to conduct such a comparison, the majority has essentially determined that in order to fully comprehend "the different environmental consequences"

of the Land Exchange, NEPA requires an analysis that mimics the MPO submission and approval process. *Id.* Does it? The majority provides no authority for such a landmark holding, leaving the legal basis for this novel NEPA requirement steeped in mystery. The majority then labels the BLM's decision arbitrary and capricious, because the agency did not conduct this newly minted judicial comparison process. *Id.* The reason why the parties might not have engaged in the majority's novel quasi-MPO process as part of the Land Exchange is readily apparent.

As discussed above, the BLM quite clearly did conduct a comparative analysis of the environmental impacts under the various alternatives, including the No Action Alternative. The majority is simply dissatisfied with the results and therefore seeks to mask its imposition of a new MPO requirement into the land exchange consideration process with the false statement that the BLM failed to make a meaningful comparison of the environmental consequences of the various alternatives studied. Ultimately this is all based on the false presumption that some undefined additional comparison would lead to substantially different findings.

What is more, the BLM did consider an alternative similar to the novel quasi-MPO requirement announced by the majority. Among the eleven alternatives initially considered in the EIS, the BLM evaluated the Mining Plan of Operation Alternative. "Under this alternative, Asarco would submit an MPO, as described in federal regulations governing mining operations on federal lands [pursuant to 43 C.F.R. § 3809]." The BLM, however, rejected this alternative from further consideration, because Asarco had not yet prepared a detailed proposed plan of operations, and because, in the BLM's view, an MPO was neither necessary to reach an informed conclusion nor required by the law it administers. Once again, this part of the record draws no attention from my colleagues, and the agency's interpretation of its regulations is given no *Chevron*

deference. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

This attempt to regulate agency action by judicial fiat quite clearly exceeds our authority. As we have held time and again, "[w]e are not free to 'impose upon the agency [our] own notion of which procedures are 'best' or most likely to further some vague, undefined public good.' " *Churchill County v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001) (quoting *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978)). "Nor may we impose 'procedural requirements not explicitly enumerated in the pertinent statutes.' " *Lands Council*, 537 F.3d at 993 (quoting *Wilderness Soc'y v. Tyrrel*, 918 F.2d 813, 818 (9th Cir. 1990)) (brackets omitted). But despite insisting that the majority's decision is consistent with *Lands Council*, it is just the opposite. According to today's opinion, the BLM was obliged to determine the exact environmental consequences under hypothetical future MPOs for hypothetical future mines and compare them to the environmental consequences of hypothetical future mines not subject to the MPO requirement. Essentially, the BLM must demand that Asarco fully explore the selected lands, develop a detailed mining plan, and submit a proposed plan of mining operations for approval —one mimicking an MPO. The BLM is then required, under NEPA, to consider that quasi-MPO as if it were in fact a filed MPO under the Mining Law. Stated in real terms, the approval process of a proposed land exchange under FLPMA henceforth incorporates, by way of NEPA, the Mining Law's governance of mining activities on public lands. But, of course, the majority will not say that if Asarco does all this, it will have complied with the Mining Law.

I find no legal basis for this newly-minted, quasi-MPO requirement—"a creature of judicial cloth, not legislative cloth, . . . not mandated by any of the statutory or regulatory provisions upon which [the majority] relied." *Weinberger*, 454 U.S. at 141. "*Lands Council* teaches that our proper role

is simply to ensure that the agency, in its expertise, made no clear error of judgment rendering its action arbitrary and capricious." *Nw. Coal. for Alternatives to Pesticides v. EPA*, 544 F.3d 1043, 1060 (9th Cir. 2008) (Ikuta, J., concurring in part, dissenting in part). Just as "we defer to the Forest Service as to what evidence is, or is not, necessary to support wildlife viability analyses," *Lands Council*, 537 F.3d at 992, we must defer to the BLM as to what evidence is, or is not, necessary to support a foreseeable environmental impact assessment of anticipated and continuing mining activities in order to make an informed "public interest" determination. *See also Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 129 S. Ct. 2458, 2473 (2009) (noting deference given to agencies' interpretations of own regulatory scheme). My colleagues clearly disagree. Who needs *Chevron* deference? Why adhere to *Lands Council*? Judges will now administer the duties Congress has entrusted to the administrative agency.

In sum, the majority's creation of the novel quasi-MPO requirement grossly oversteps our role in reviewing agency action and is irreconcilable with our precedent. Indeed, it signals a return to the type of overly zealous scrutiny applied in *Ecology Center, Inc. v. Austin*, 430 F.3d 1057 (9th Cir. 2005), which we expressly overruled in *Lands Council*. *See* 537 F.3d at 990. As was the case in *Lands Council*, the agency "is at liberty, of course, to [conduct further analysis] if it deems it appropriate or necessary, but it is not required to do so." *Id.* at 991-92. It is certainly not for us as Article III judges to feign superior expertise in such specialized areas and to micro-manage agencies in executing their congressionally delegated administrative functions.

The majority attempts to evade the clear language of our unanimous en banc opinion in *Lands Council* by arguing that "[t]he NEPA issue in the case now before us is quite different from the NEPA issues in *Lands Council*." Amend. Maj. Op. at 16170. That is as true as it is irrelevant. The common issue in *Lands Council* and in our case is the level of deference due

an agency decision under NEPA. That level of deference is just as applicable to the BLM's "comparison among alternatives" as it is to the Forest Service's "failures to discuss scientific uncertainty, to cite adequate evidence, or to examine adverse impacts." *Id.* The majority declares that the BLM failed to make such a comparison here. *Id.* at 16171. As discussed above, that is simply not the case; the majority just does not like the conclusion reached by the BLM after the comparison was made.

NEPA is a procedural mechanism. *Lands Council*, 537 F.3d at 992 (noting that a substantive requirement "cannot be derived from the procedural parameters of NEPA" (quoting *Ecology Ctr.*, 430 F.3d at 1073 (McKeown, J., dissenting))). It was satisfied here. The BLM did what was required of it under the circumstances of this case—it took a "hard look" at the reasonably foreseeable environmental consequences of the exchange and the various alternatives. We should have applied an "approach [that] respects our law that requires us to defer to an agency's determination in an area involving a high level of technical expertise," *id.* at 993 (internal quotation marks omitted), and rejected CBD's challenge under NEPA.

## B

The majority opinion's curt analysis regarding FLPMA is perhaps even more problematic and falters for the reasons stated above. Rather than engaging the material legal question whether or not the Land Exchange was in the public interest, *see* 43 U.S.C. § 1716(a), my colleagues repeat their flawed NEPA analysis, stating: "The manner in which Asarco engages in mining on the selected lands is likely to differ depending on whether the land exchange occurs, and the environmental consequences will differ accordingly." Amend. Maj. Op. at 16167-68. Despite the BLM's well-articulated bases for its approval of the Land Exchange, the majority

declares that this alone renders the reasoned "public interest" determination arbitrary and capricious.

That declaration ignores the fact that, in the ROD, the BLM gave five main reasons why approval of the Land Exchange was in the public interest and thus satisfied § 206 of FLPMA:

1) Facilitating better land management by acquiring private lands within special areas of designation (the McCracken Desert Area of Critical Environmental Concern (ACEC) which exhibit a "checker board" land ownership pattern and removing inholdings from the Mt. Tipton Wilderness). This will remove resource and use conflicts, facilitate a more efficient management, and enable better implementation of resource management plan (RMP) decisions for the Kingman RMP.

2) Improving wildlife and ACEC habitats by adding the Gila River at Cochran parcel and McCracken ACEC parcels to federal protection and management. The Gila River parcel (320 acres) supports threatened and endangered species by providing critical habitat for the cactus ferruginous pygmy-owl and occupied habitat for the southwestern willow flycatcher. The McCracken ACEC provides 6,500 acres of Category I desert tortoise habitat. The Sacramento Valley and Tomlin parcels also support Category I and II desert tortoise habitat.

3) Supporting resource objectives for improving riparian zones by acquiring parcels along the Big Sandy and Gila Rivers. Tomlin Parcel #4 and the Gila River at Cochran Parcel contain riparian values and enable more efficient and effective management of riparian zones along those rivers.

4) Continuing to support mining activities as approved in the Phoenix RMP. The exchange pro-

vides lands which will enable Asarco to plan expansions, comply with environmental permits, buffer operations from surrounding lands, and continue operating on parcels with approved mine plans of operations (MPOs) authorized under 43 CFR 3809.

5) Improving management of mineral rights by removing split estate lands from BLM administration (2,808 acres) of federal estate below state or private surface and from parcels with existing operations under approved MPOs. This does not alter federal permits from other agencies administering significant environmental programs such as the Clean Water Act and Clean Air Act.

"As an additional rationale for approving the land exchange," the ROD also noted that "the continuation of mining [was] the foreseeable use of most of the selected lands whether the exchange occurs or not." In reaching this conclusion, the BLM referred to the Mining Law and Asarco's rights arising from its 747 mining claims, Asarco's pending patent application for portions of the selected lands (which, if approved, would convey fee title to Asarco), mineral potential reports indicating the presence of ore bodies that may have economic potential for future mining, and the current use of parcels in the neighboring Ray Mine Complex, which was 100% mining-related.[8]

---

[8]Despite the BLM's meaningful discussion on the topic, the majority curiously proclaims that the ROD did not address the objection raised by the EPA, the Bureau of Indian Affairs, and the Sierra Club to the BLM's assumption that the foreseeable use of the selected lands will be mining, whether or not the exchange occurs. *See* Amend. Maj. Op. at 16156, 16171 (accusing the BLM of "*not* respond[ing] to the second sentence" of the objection). In direct response to that objection, the ROD cited the "FEIS General Response Section 7.4.5 and 7.4.6," as the opinion acknowledges, and went on to explain that mining is already an "approved use" under the current resource management plan and that analysis "indicated that mineral development would continue or increase" in the selected lands. Finally, the ROD referenced, in an immediately following sentence, the "FEIS sections that deal with the foreseeable uses in the absence of mining plans of operations," which are discussed above.

Moreover, the ROD recognized that, under the No Action Alternative, the BLM must anticipate substantial future management actions, including processing multiple MPOs and patent applications, while the offered lands would remain in Asarco's ownership and most likely be divided into smaller parcels and sold for profit. In other words, significant portions of the selected lands would inevitably be burdened by mining-related activities, either pursuant to Asarco's mining claims or after fee title was conveyed to Asarco through the patenting process. Simultaneously, the offered lands, which would provide significant public benefit under federal ownership (e.g., as described in paragraphs (1) through (3), quoted above), would remain in private hands and likely be subject to subdivision and private development, including possible mining activities. How could the public interest possibly be served by this outcome? This reality weighed heavily in the BLM's determination.

The majority's analysis literally ignores the reasons provided in the ROD and the sound logic of the BLM in determining which course best serves the public interest. Indeed, it further ignores the Protest Decision of the BLM Arizona State Director, upholding the BLM's public interest determination, and the IBLA's expertise and experience in denying CBD's administrative appeal. *See Ctr. for Biological Diversity*, 162 IBLA 268 (2004).[9] Finally, it ignores the district

---

[9]The majority selectively quotes language from the concurring opinion, claiming that it supports its wayward NEPA analysis. *See* Amend. Maj. Op. at 16156-57 (quoting *Ctr. for Biological Diversity*, 162 IBLA at 291 (Hemmer, Admin. J., concurring)). But the majority omits the paragraph immediately following the quoted text, which fully conveys Administrative Judge Hemmer's concurrence in the result reached by the IBLA:

> Nonetheless, I agree with the lead opinion that [CBD's] arguments do not sufficiently take into account the record and the mining uses of the land evident therein, nor the above-described facts, in suggesting that mining would be entirely different if the selected lands were not transferred outside of Federal ownership

court's summary judgment in favor of Asarco and the BLM, rejecting as a matter of law CBD's continued objection to the Land Exchange. Instead, the opinion focuses solely on the "additional rationale" that the BLM mentioned in further support of its determination. Based entirely on their suspicion that the mining activities "may" differ depending on whether the Land Exchange is consummated, my colleagues hold that the extensive agency analysis approving the Land Exchange was, in its entirety, arbitrary and capricious.

I cannot agree with this result, which seems uninterested in the BLM's actual "public interest" determination. Nor can I condone an approach that gives short shrift to the deference judges are supposed to apply to agency action review under our en banc decision in *Lands Council*. As previously discussed, there was nothing improper about the BLM's evaluation of the foreseeable use of the selected lands. Even if there were gaps or imperfections in the BLM's analysis, the agency action here still does not rise to the level of an arbitrary or capricious determination.

## IV

In reaching its result, the majority focuses almost exclusively on the regulatory mechanism behind MPOs, while at the same time diminishing or ignoring altogether Asarco's substantial preexisting mining rights under the Mining Law, the standard for and purpose of FLPMA land exchanges, and the state and federal environmental regulations that remain

---

and that BLM thereby did not adequately identify the effects of the proposed action.

162 IBLA at 291 (Hemmer, Admin. J., concurring). Thus, whether or not she believed that the BLM *might have been able* to conduct a more thorough environmental analysis, *see* Amend. Maj. Op. at 16156-57, 16165, 16171, she determined that such an analysis was *not required by law*. The majority today nonetheless engrafts that requirement onto the statute under the guise of interpreting it.

applicable to the selected lands whether under private or public ownership. The thrust of the opinion relates to the difference in governmental oversight of mining operations conducted on federal versus non-federal lands, i.e., whether prior agency approval of mining plans is required. This demonstrates a clear distrust of Asarco and the BLM—a distrust unsupported in the extensive record before us.

The majority is plainly concerned about the unavoidable uncertainty regarding the ultimate environmental impacts that will occur, which admittedly could be substantial and perhaps different than estimated in the EIS. Apprehension over a speculative outcome should neither drive a particular result nor prompt the creation of bad law.[10] Unfortunately, my colleagues have succumbed to this temptation and, in doing so, have sacrificed the integrity of our precedent and the best interests of the public in order to achieve a particular outcome in the instant case.

The majority's holding is shortsighted and unreasonably impairs the BLM's ability to effectively manage the public lands in a manner that we all desire. In practice, the newly minted quasi-MPO requirement will unquestionably stifle, if not altogether stymie, land exchanges, especially whenever mining companies are involved or mining-related activities are contemplated. Indeed, this judicially created obstacle would be, in application, an impenetrable wall.

Furthermore, by grafting this time-consuming and expensive process onto FLPMA's "public interest" determination (ostensibly though NEPA), our opinion today eliminates one

---

[10]I also note that a mining company could theoretically deviate from an approved MPO or quasi-MPO after a land exchange is effectuated once the public land is conveyed to private ownership. Therefore, I suspect that the majority's new NEPA hurdle does not resolve its concerns and, practically speaking, serves no legitimate purpose other than to defeat the Land Exchange.

key incentive that encourages private landowners, such as Asarco and other mining claim holders, to offer their valuable private property in exchange for federal land. Like it or not, most businesses are driven largely by economic considerations. At some point, claim holders will elect to simply exercise their rights under the Mining Law to the offered lands and proceed through the MPO or patenting process in order to engage in mining activities and to simultaneously develop or market their valuable private lands for additional commercial gain. Then what? The public would be deprived of the offered lands, which are undisputedly superior in almost all respects (except for mineral deposits) to the selected lands— a collection of scattered parcels near an active, large-scale mining operation, which are, and which will continue to be, heavily burdened by mining claims. In addition to being legally untenable, the majority's approach announced today is impractical, misguided, and contrary to the best interests and welfare of the public at large.

It is not the personal opinions of judges that matter in determining whether the Land Exchange is in the best interests of the public. *See* Amend. Maj. Op. at 16173. What matters is whether the agency followed a reasonable process in reaching its conclusion. The BLM determined that the Land Exchange was in the public interest, as required by FLPMA, for all the reasons detailed above. As summarized in the ROD, the offered lands "have high public values for: wilderness inholdings . . . ; riparian zones . . . ; other habitat supporting threatened and endangered or special species; and cultural and recreation values. The public interest will be served by making the exchange."

## V

The BLM's conclusion that the foreseeable use of the selected lands includes mining activities and related uses is certainly supported by substantial evidence in the record. *See Dickinson v. Zurko*, 527 U.S. 150, 163-64 (1999) (noting that

the standard is even more deferential than the clearly errone-ous standard of review). Neither NEPA nor FLPMA requires that Asarco prepare and submit a quasi-MPO or that the BLM conduct a quasi-MPO approval process in order to determine whether a proposed land exchange is in the public interest.

I would faithfully apply our precedent and affirm the dis-trict court's summary judgment in favor of the BLM and Asarco. Today's opinion embodies the type of judicial med-dling in agency action that we intended to put to rest in *Lands Council.* Its implications are far-reaching and severe. I respectfully dissent. Has anyone seen the canary?